# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NATALIE SHAY,

      Plaintiff,

vs.                                        No. CIV 13-0140 JB/ACT

RWC CONSULTING GROUP, a Texas
Corporation, GEORGE WREN, Manager
for RWC Consulting Group, individually,
CLAIRE E. OSBORNE, Secretary and
Treasurer of RWC Consulting Group,
individually,

      Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss Complaint, filed February 15, 2013 (Doc. 6)("MTD").  The Court held a hearing on June 24, 2013.  The primary issues are: (i) whether Plaintiff Natalie Shay has stated a plausible claim that Defendant RWC Consulting Group ("RWC") violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 to -17 ("Title VII"), or the Pregnancy Discrimination Act, Pub. L. No. 95-555, 92 Stat. 2076 ("PDA"); (ii) whether Shay's breach-of-contract claim, Count IV, is a viable claim under federal law; and (iii) whether the Court should remand the state law claims to state court if it dismisses all of the federal claims.  The Court concludes that Shay has not stated a plausible Title VII or PDA claim, because the Complaint's allegations "encompass a wide swath of conduct, much of it innocent," and thus Shay "'ha[s] not nudged [her] claims across the line

---

[1]The Court entered an Order, filed September 24, 2013 (Doc. 24), denying the Defendants' Motion to Dismiss Complaint, filed February 15, 2013 (Doc. 6), and stating: "The Court will . . . issue a memorandum opinion more fully detailing its rationale for this decision." Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

from conceivable to plausible.'"  Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The Court also concludes that Count IV is not a viable cause of action, because Executive Order 11246 manifests no intention to impart an actionable right on federal contractor employees, like Shay, as third-party beneficiaries to federal contracts.  Last, having granted the MTD as to all federal claims -- those being Counts II, III, and IV -- the Court will, pursuant to 28 U.S.C. § 1367(c)(3), decline to exercise its supplemental jurisdiction and will remand the remaining claims to state court.

## FACTUAL BACKGROUND

This case arises out of an employment dispute that Shay brought against her former employer, RWC, and its officers, Defendants George Wren and Claire Osborne.  See Complaint for Violations of Civil Rights, for Tort and for Breach of Contract ¶¶ 1-5, at 1-2, filed in state court on January 30, 2013, filed in federal court on February 11, 2013 (Doc. 1 at 18)("Complaint").[2]  The Court takes the facts from the Complaint, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rule of Civil Procedure.  "RWC was an independent contractor with the federal government and maintained the discretion to operate its company outside the direction of the federal government." Complaint ¶ 22, at 4.  RWC employed Shay from approximately October 10, 2008 through November 4, 2011; she had no significant performance or conduct issues.  See Complaint ¶¶ 12-14, at 3.

_____

[2]The Complaint is attached as Exhibit A to the Notice of Removal, filed February 11, 2013 (Doc. 1), but is not marked as an exhibit on CM/ECF.  As such, the Complaint's own internal pagination differs from the CM/ECF document pagination; the Complaint appears on pages 18 to 31 of the document.  The Court will refer to the Complaint's internal pagination in this Memorandum Opinion.

Shay became pregnant, with a due date of October 15, 2011.  See Complaint ¶¶ 17-18, at 3.  Shay informed RWC "that she was pregnant and that she intended to take four (4) weeks of maternity leave upon the birth of her child."  Complaint ¶ 24, at 4.  On about August 11, 2011, Shay met with Wren and Stephanie Knapp;[3] Shay "was informed that she may not have a job when she returned from maternity leave."  Complaint ¶ 25, at 4.  Osborne sent Shay an electronic mail transmission approximately six days later, on about August 17, 2011, informing Shay that if she took that amount of leave, "her job could not be guaranteed to be available to her when she returned."  Complaint ¶ 26, at 4.

Medical complications required Shay to leave work on about September 9, 2011, and confined her to bed rest; she gave birth on September 22, 2011.  See Complaint ¶¶ 27-29, at 4.  On October 22, 2011, Shay informed Knapp that she wanted to come back to work on October 31, 2011; Knapp told Shay she would tell Wren, and talk to Shay.  See Complaint ¶ 30, at 4.  Shay met with Knapp two days later, on October 22, 2011; Knapp had not received word from Wren or Osborne.  See Complaint ¶ 31, at 5.  Shay contacted Wren five days later, on October 27, 2011; Wren said he would know the following week.  See Complaint ¶ 32, at 5.  Shay contacted Wren again on November 4, 2011; Wren told her "to go ahead and collect unemployment."  Complaint ¶ 33, at 5.  Shay argues that RWC "constructively fired" her on that date.  Complaint ¶ 34, at 5.

Shay believes Wren and Osborne decided to fire her because of her pregnancy.  See Complaint ¶¶ 16, 19, at 3.  In her view, the Defendants had no nondiscriminatory reason to terminate her, and their alleged reasons for doing so are pretextual.  See Complaint ¶ 39, at 5.

---

[3]The Court is not sure what Knapp's job title or relationship to Shay was, as it is not specified in the Complaint, but the Court assumes that Knapp is Shay's superior in some way.

At the time of the events in the Complaint, RWC held a federal contract with the United States Forest Service.  See Complaint ¶ 89, at 11.  As a federal contractor, Executive Order 11246 requires RWC's "contract with the federal government include a specific provision prohibiting discriminating in employment decisions on the basis of . . . sex, [and] to take affirmative action to ensure that equal opportunity is provided in all aspects of their employment."  Complaint ¶ 88, at 10.  Shay contends that she is an intended third-party beneficiary of that contract, and that RWC breached that contract by "fail[ing] to protect the employment of Ms. Shay while she was pregnant and then on her resulting maternity leave."  Complaint ¶ 92, at 11.  Further, Shay argues that RWC breached the contract's affirmative-action provision "by firing Ms. Shay for missing work because she was pregnant and then on maternity leave."  Complaint ¶¶ 94-95, at 11.  After RWC fired Shay, it lost its federal contract, but the federal government engaged a new contractor for a contract term of five years; the new contractor retained all of RWC's local employees.  See Complaint ¶¶ 20-21, at 3.

## PROCEDURAL BACKGROUND

Shay alleges five causes of action: (i) Count I, a state law claim for violation of the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-1 to -14 ("NMHRA"), see Complaint ¶¶ 23-44, at 4-6; (ii) Count II, a claim under federal law for violation of the PDA, see Complaint ¶¶ 45-64, at 6-8; (iii) Count III, a claim under federal law for violation of Title VII, see Complaint ¶¶ 65-84, at 8-10; (iv) Count IV, a state law claim for breach of contract, see Complaint ¶¶ 85-99, at 10-12; and (v) Count V, a state law claim for intentional infliction of emotional distress ("IIED"), see Complaint ¶¶ 100-108, at 12-13.  Shay filed the case in state court, and the Defendants removed it to federal court, arguing that the Court has original federal question jurisdiction, see Notice of Removal at 2, filed February 11, 2013 (Doc. 1)(citing 28 U.S.C.

§ 1331 (authorizing federal-question jurisdiction); 28 U.S.C. § 1441 (authorizing removal jurisdiction)), over the Title VII claim, and supplemental jurisdiction over the state claims, see Notice of Removal at 2 (citing 28 U.S.C. § 1367 (authorizing supplemental jurisdiction)), but not diversity jurisdiction, see 28 U.S.C. § 1332 (authorizing diversity jurisdiction; not cited in the Notice of Removal or Complaint).

The Defendants move the Court to dismiss each cause of action.  See MTD ¶¶ A-G, at 3; Defendant's Memorandum Brief in Support of Motion to Dismiss Complaint, filed February 15, 2013 (Doc. 7)("MTD Memo.").  With respect to Shay's NMHRA claims, the Defendants allege that she "has not identified any employees who were treated any differently than she was nor has she identified any employee who allegedly replaced her," as she is required to do to satisfy her burden.  MTD Memo. at 3-4.  Further, the Defendants argue that Shay failed to exhaust her administrative remedies, because she "failed to identify any individual respondents to her claims by name" and did not amend her charge of discrimination until the same day that the New Mexico Department of Workforce Solutions Human Rights Bureau ("HRB") issued its Determination of No Probable Cause.  MTD Memo. at 4-6.

With respect to Shay's Title VII and PDA claims, the Defendants argue that: (i) her PDA claim fails, because she was not "a member of a protected class under the PDA because she was not pregnant or experiencing the [e]ffects of pregnancy at the time of her separation of employment"; and (ii) her PDA and her Title VII claims both fail, because she "does not and cannot allege that similarly-situated employees who were not pregnant received more favorable treatment than she did."  MTD Memo. at 6-7.  With respect to Shay's breach-of-contract claim, the Defendants allege that Executive Order 11246 does not create an implied right of action for breach of contract and that the law does not support her contention that she was a third-party

beneficiary of a federal contract.  See Complaint at 7-8.  The Defendants also argue that the Court should dismiss Shay's IIED claim, because Shay's allegations amount to conclusory recitations of the tort's elements and that her complaint sets forth no facts to support her claim. See MTD Memo. at 8-9.

Shay disputes each argument.  See Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Complaint, filed March 4, 2013 (Doc. 11)("Response").  Her Response frames the issue as one of "notice": in her view, her Complaint gives sufficient notice of her allegations, and she "is not required to plead a prima facie case to meet her pleading requirements" under rule 8(a)(2) of the Federal Rules of Civil Procedure.  Response at 4.  She contends that "[t]he *prima facie* elements are an evidentiary standard, not a pleading standard," and she needed only plead enough facts to render her claim for relief under Title VII plausible. Response at 5.  Shay quotes the MTD Memo.'s recitation of her causes of action as evidence that her Complaint's allegations satisfy her burden.  See Response at 6-7.

With respect to the NMHRA claim, Shay contends that she exhausted her administrative remedies.  See Response at 7.  Shay maintains that documentary evidence shows that, despite the agency's failure to list Wren and Osborn in their letter, the agency "was aware of and accepted an amendment of the Charge of Discrimination to include the individual Defendants."  Response at 8.  According to Shay, the Court should take judicial notice of that documentary evidence in considering the MTD.  See Response at 8-9.

Shay argues that she has satisfied her burden under Title VII and the PDA.  See Response at 9.  In her view, the Defendants' first argument -- that the Court should dismiss her PDA claim, because she was not "a member of a protected class under the PDA because she was not pregnant or experiencing the [e]ffects of pregnancy at the time of her separation of employment"

-- must fail, because she has established "that although qualified for her position, she was terminated from employment while on maternity leave, and thus is a member of the PDA's protected class." Response at 11.  Regarding the Defendants' second argument, Shay argues that she does not need to show that RWC filled her position with someone who had not recently been on maternity leave; in her view, "she may also satisfy the *prima facie* elements of a pregnancy discrimination case by asserting, as she has done here, that her termination occurred under circumstances that give rise to an inference of discrimination."  Response at 11.

With respect to her breach-of-contract claim, Shay argues that the law is too unsettled for the Court to dismiss her claim.  See Response at 12.  In her view, she is a third-party beneficiary of RWC's federal contract, and

> "[i]f Congress intended statutes such as Title VII, the PDA and the [Family Medical Leave Act] to create rights for employees, it is plausible and likely that the Executive Branch intended to create similar rights for the employees of federal contractors who may be beyond the reach of the laws passed by Congress in the private sector.

Response at 12.  Shay cites opinions from district courts stating that plaintiffs may, in fact, bring claims as third-party beneficiaries of Executive Order 11246, and that, while there may be no implied private right of action under the Executive Order, plaintiffs may still bring state-law contract claims.  See Response at 13.  Further, in Shay's view, the federal government does not so pervasively regulate federal contractors that permitting Shay to sue under the Executive Order would unduly disrupt an administrative regime.  See Response at 14.  Shay maintains that state law claims like hers "will not create any uncertainty as to the obligations of those who are subject to the important policies of 11246 by virtue of their contracting with the federal government."  Response at 14-15.

Turning to her IIED claim, Shay argues that her termination was because of her pregnancy and represents "antiquated views on women in the workplace," which lie "at the heart of the prohibitions under the Pregnancy Discrimination Act and Title VII."  Response at 16. Shay argues that the "Defendants['] intentional discrimination of Plaintiff was an atrocious act that Ms. Shay found to be intolerable[,] and thus caus[ed] damages."  Response at 16.  Shay asserts that her "Complaint clearly sets out facts to support a plausible finding that Defendants' termination of Ms. Shay while she was on maternity leave goes beyond all possible bounds of decency and is intolerable to the ordinary person."  Response at 16.

In Defendant's Reply to Plaintiff's Response to Motion to Dismiss Complaint, filed March 21, 2013 (Doc. 13)("Reply"), the Defendants substantially reiterate their MTD Memo. arguments.  The Defendants contend that the Court should dismiss Shay's Complaint, because she did not allege that the Defendants treated her any differently "than any other employee who took unpaid leave for any reason from their employment with RWC."  Reply at 2-3.  The Defendants argue that Shay has not explained "why she failed to name . . . Wren and Osborn in her original charge when she knew or should have known when she filed her charge that she intended to hold them liable for damages."  Reply at 3.  Further, the Defendants point out that Shay has not presented "evidence that Wren and Osborne knew they were intended respondents to the charge."  Reply at 3.  According to the Defendants, Osborne is not mentioned anywhere in the HRB's "Determination[,] and there is no evidence that the . . . evidence encompassed Osborne in any way."  In their view, Shay's "failure to timely name Wren and Osborne prevented them from [being afforded] a fair and adequate opportunity to respond to her charge, or for the [New Mexico Human Rights Board] to complete a full and fair investigation, during the administrative process."  Reply at 3-4.

With respect to Shay's Title VII and PDA claims, the Defendants contend that the PDA requires only that employers treat pregnant employees like non-pregnant employees. See Reply at 4.  According to the Defendants, Shay was only a contract employee, and "her employment was based on the needs of the client she was assigned to, and when she wanted to return to work the client had reduced its staff and no longer required her contract services."  Further, the Defendants argue that Shay's Title VII claims fail for the same reason: she "has not and cannot allege that employees similarly situated to her received more favorable or different treatment." Reply at 4.

The Defendants argue that the Court should dismiss Shay's breach-of-contract claim under Executive Order 11246.  See Reply at 5.  According to the Defendants, the Tenth Circuit, among other courts, have held that the Executive Order does not create a private right of action and that her "attempt to characterize her claim as a third-party beneficiary breach of contract claim is not cognizable."  Reply at 5.  The Defendants further contend that Shay's argument that her claim arises, not under the Executive Order, but under the subsequent contract between RWC and the U.S. Forest Service, fails, because the Executive Order mandates only that federal agencies include equal opportunity clauses in their contracts.  See Reply at 5.  In their view, Shay styles her claim in this way to make relevant cases that permit "enforcement of consent decrees arising under Executive Order 11246 separate from an original government contract in order to support her common law breach of contract claim."  Reply at 6.  The Defendants assert that Shay "cannot pursue a derivative third-party breach of contract claim arising under the provisions of Executive Order 11246."  Reply at 6.

The Defendants also distinguish cases "which permitted a breach of contract claim to proceed under state law which was not based on Executive Order 11246."  Reply at 6.  In their

view, cases that "refuse[] to permit a private cause of action under Executive Order 11246 and executive orders containing similar language" preclude this argument, in large part because "that litigation would disrupt the administrative scheme established by the Order, and its supplementing regulations."  Reply at 6.  In sum, in the Defendants' view, Shay "has no private cause of action under Executive Order 11246[,] and permitting her common law breach of contract claim[,] which is derivative of Executive Order 11246[,] to proceed would be contrary to the statutory scheme."  Reply at 6-7.  Finally, with respect to Shay's IIED claim, the Defendants reiterate their argument that Shay's Complaint relies only upon conclusory allegations and not upon specific facts.  See Reply at 7.

The Court held a hearing on June 24, 2013.  See Transcript of Hearing, taken June 24, 2013 ("Tr.").[4]  The Court and the parties first discussed the NMHRA claim.  See Tr. at 3:8-15:20 (Court, Montoya, Sanchez).  The discussion then turned to the Title VII exhaustion issue, with the Defendants arguing that Shay failed to exhaust her administrative remedies because she failed to timely name the individual Defendants -- in particular Osborne -- in her charges with the HRB and Equal Employment Opportunity Commission ("EEOC"), see Tr. at 15:21-25:13 (Court, Montoya), and with Shay responding that the HRB accepted her amendment -- even though concededly being made on the day of the EEOC's Determination of No Probable Cause -- and that said acceptance is sufficient to establish exhaustion, see Tr. at 25:15-27:16 (Court, Sanchez).

The hearing then turned to the Title VII and PDA claims.  See Tr. at 35:24-49:14 (Court, Montoya, Sanchez).  The Court first asked whether, "when you sue under [the PDA,] you [are]

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

still suing under Title VII?"   Tr. at 36:19-20 (Court).   The Defendants responded in the affirmative that the PDA is an amendment to Title VII, effectively adding pregnancy to the list of protected classes.  See Tr. at 36:21-37:2 (Court, Montoya).  The Defendants argued that Title VII, as modified by the PDA, requires "employer[s ] to treat pregnant women the same as [they] would other employees . . . [w]ith a medical condition."  Tr. at 37:4-6 (Montoya, Court).  Shay appeared to concur with the proposition that the PDA/Title VII requires only that employers treat pregnant women the same as any other employee with a temporary disability -- acknowledging that RMC was not obligated to provide Shay with any period of maternity leave, as it was not covered under the Family and Medical Leave Act, see Tr. at 46:8-11 (Sanchez)("My understanding is t[hat] RWC is . . . not required to comply with the FMLA in Albuquerque because of the number of employees that they have within a certain radius.  So she did not have that protection.") -- but that she could not be required to plead RWC's policy for handling temporarily disabled employees, because she "ha[d] no idea" what that policy is, Tr. at 44:23 (Sanchez).

The Court asked whether it was bound to treat NMHRA claims identically to Title VII claims on the basis of the Tenth Circuit's statement in Orr v. City of Albuquerque, 531 F.3d 1210, 1214 n.2 (10th Cir. 2008), that a plaintiff's burden is identical under the two statutes.  See Tr. at 39:12-15 (Court)(citing Response at 9 n.7).   The Defendants replied that the only difference was that the NMHRA provides for individual liability while Title VII did not, see Tr. at 39:24-40:2 (Montoya), while Shay contended that, although the New Mexico courts model NMHRA claims off of federal case law interpreting Title VII, the Court was free to interpret the statutes differently, see Tr. at 50:18-52:21 (Court, Sanchez), and she indicated that the NMHRA "could be broader than Title VII," Tr. at 52:7-8.

The Court moved to the breach-of-contract claim.   See Tr. at 52:22-64:10 (Court, Montoya, Sanchez).   The Court first asked the Defendants: "Would you agree with me that this is a state-law claim?"  Tr. at 52:23 (Court).  The Defendants responded that they did not agree, see Tr. at 52:24 (Montoya), because

> the plaintiff [is] alleging that RWC is a federal contractor and that they're governed by this [Executive] order 11246[, of which] the . . . plaintiffs [are] the third party benefi[ciaries] . . . and she's suing under that [unintelligible] and the case law that we cite in our motion and reply all specific[ally] state there's no private cause of action under [E]xecutive [O]rder 11246.

Tr. at 53:6-11 (Montoya).  The Court pushed back on the Defendants, asking whether, if the PDA/Title VII claim had never been brought, they would have been able to remove their case. See Tr. at 53:16-20 (Court).  The Defendants responded that they "believe so, because [they] think there might have been diversity."  Tr. at 53:21-22 (Montoya).  The Court asked whether the Defendants had pled diversity in their Notice of Removal, and the Defendants responded that they had not.  See Tr. at 53:23-54:1 (Court, Montoya).

The Court intimated that, as "everybody would agree there's not an implied cause of action," Tr. at 54:17-18 (Court), the claim's federal ingredients "may not be enough for it to be a federal question," Tr. at 54:21-22 (Court).  The Defendants responded that they "don't know," and "haven't entertained that question."  Tr. at 54:23-24 (Montoya).  The Court asked why a state court could not adjudicate a breach-of-contract claim where the contract was between RWC and the federal government, and an Executive Order mandated the term, see Tr. at 55:9-18 (Court), asking, "[i]f the state wants to recognize it, why do -- why does the federal court care," Tr. at 55:17-18 (Court).  The Defendants responded that such a claim "would get tangled up in the administrative scheme."  Tr. 55:19-20 (Montoya).

The Court and the parties next discussed Shay's IIED claim.  See Tr. at 64:11-69:18 (Court, Montoya, Sanchez).  The Defendants argued that IIED claims are only viable for employment terminations in extreme circumstances, see Tr. at 64:14-65:2 (Montoya), and that, regardless, because Shay had been warned of her possible termination upon taking maternity leave, "[t]here shouldn't have been a shock" when there was not "a job when she got back," Tr. at 65:4 (Montoya).  Shay argued that it was plausible that a reasonable fact-finder could find that terminating Shay for her pregnancy was outrageous.  See Tr. at 66:1-67:13 (Sanchez).  The Court stated that its understanding of the law was in line with the Defendants, that "New Mexico's raised the bar so much on . . . intentional [infl]iction of emotional distress that this one simply[] doesn't get there," Tr. at 69:12-14 (Court), and that it was "inclined to grant the motion [and] dismiss Count 5," Tr. at 69:18 (Court).

Last, the Court asked the parties whether, if it dismissed the federal claims -- which it defined as "clearly the Title VII . . . claim, [and] maybe also this breach-of-contract claim," Tr. at 69:25-70:1 (Court) -- whether it should remand the case to state court, see Tr. at 69:23-70:3 (Court).  The Defendants responded that they "honestly couldn't . . . answer that without . . . knowing Wren's [citizenship]."  Tr. at 70:4-5 (Montoya).  Shay replied that, while she was unaware of Wren's citizenship -- but "probably would assume that he is also out of state," Tr. at 70:24-25 (Sanchez) -- the case should be remanded if the federal claims were to be dismissed, see Tr. at 70:20-21 (Sanchez).  Shay clarified that, to her, that means that if the Court were to dismiss the Title VII claim, but not necessarily the breach-of-contract claim, then the Court should remand the case back to state court.  See Tr. at 71:5-7 (Sanchez).  She acknowledged that she was "sure that the Court would have the right for pendent jurisdiction but . . . without the

federal claims," she did not think that "it would be the best judicial use of a federal [c]ourt's time." Tr. at 72:4-7 (Sanchez).

The Defendants argued that, because "notice of removal can be filed any time that there's grounds for the notice of removal, . . . if . . . it turned out that [they] did have gr[ound]s for diversity [they] think that would be an option that the defendant[s] would have." Tr. at 72:8-12 (Montoya).  The Court responded to that contention by noting that, although it is "about as liberal as any of [its] colleagues about removal . . . you can't change the grounds -- you can't amend and add a new ground [of jurisdiction]." Tr. at 14-17 (Court).  The Defendants countered with the assertion that the proper standard permits a removing defendant to change the asserted jurisdictional grounds if new ones arise or the defendants receive new knowledge establishing a preexisting ground, see Tr. at 72:20-23 (Montoya), but that they were "probably likely to stay there [in state court] if it was remanded on state grounds only," Tr. at 72:24-25 (Montoya).  The Court asked the parties to send it a letter regarding Wren's state of citizenship, because, if he turns out to be a New Mexico citizen, then diversity is not a viable ground, regardless whether the Defendants could amend their Notice of Removal to assert it.  See Tr. at 73:2-7 (Court).  The Court stated that it would delay the case until it could resolve and produce an opinion on the MTD, and decide whether to remand the case.  See Tr. at 74:12-21 (Court).  To date, no party has submitted a letter informing the Court of Wren's citizenship status.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency

of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).   "Thus, the mere metaphysical

possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."   Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).   The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."   The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d at 1247 (citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.   If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").   The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.   See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004).   If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the

defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.). The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), although the Tenth Circuit has not squarely addressed this practice.

## LAW REGARDING FEDERAL-QUESTION JURISDICTION

A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Federal question jurisdiction exists when "a federal question is presented on the face of the plaintiff's properly pleaded complaint."  Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)).  As "the master of the claim," the plaintiff may

choose to sue in state court rather than in federal court "by exclusive reliance on state law." Caterpillar, Inc. v. Williams, 482 U.S. at 392.

The defendant may not try to sneak a federal question through the back door by raising a federal defense, for "it is now settled law that a case may not be removed to federal court on the basis of a federal defense . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Caterpillar, Inc. v. Williams, 482 U.S. at 393 (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 12 (1983)).  See Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1236 (10th Cir. 2003)("It is well settled that '[a] defense that raises a federal question is inadequate to confer federal jurisdiction.'"  (quoting Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 808 (1986))).  While a plaintiff is free to plead a federal question in his complaint, "a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated."  Caterpillar, Inc. v. Williams, 482 U.S. at 399.  Even the plaintiff can only go so far in attempting to invoke federal-question jurisdiction, because "[a]ny statements in the complaint which go beyond a statement of the plaintiff's claim and anticipate or reply to a probable defense are to be disregarded" in deciding whether federal-question jurisdiction exists.  Mescalero Apache Tribe v. Martinez, 519 F.2d 479, 481 (10th Cir. 1975).

In addition to the requirement that the federal question appear on the face of the complaint, a "plaintiff's cause of action must either be: (i) created by federal law; or (ii) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'"  Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting

Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 808).  As for the second method, beyond the requirement of a "substantial" question of federal law at the heart of the case, the federal question must also be "actually disputed," and its resolution must be necessary to resolution of the case.  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005).  Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 313.  In particular, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state law claim that will overwhelm the judiciary with cases traditionally heard in state courts.  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. at 318-19 (explaining that "there must always be an assessment of any disruptive portent in exercising federal jurisdiction" in accepting "garden variety" state law claims).  See also David L. Hanselman, Supreme Court Federal Removal Jurisdiction, For the Defense at 25, 65, September 2005 ("The most important consideration is whether removal would federalize a garden-variety tort, contract, or fraud claim, or whether there is some uniquely federal aspect of the case that, if removed, could be adjudicated in federal court without subjecting the federal courts to a flood of original filings or removals.").

The Supreme Court of the United States has underscored that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 813.  Indeed, the Supreme Court has "forcefully reiterated" that district courts must exercise "prudence and restraint" when determining whether a state cause of action presents a federal question because "determinations about federal jurisdiction require sensitive judgments about congressional intent,

judicial power, and the federal system."   478 U.S. at 810; Morris v. City of Hobart, 39 F.3d 1105, 1111 (10th Cir. 1994).

Under the well-pleaded complaint rule, the federal question giving rise to jurisdiction must appear on the face of the complaint. See Karnes v. Boeing Co., 335 F.3d 1189, 1192 (10th Cir. 2003). This rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). See Schmeling v. NORDAM, 97 F.3d 1336, 1339 (10th Cir. 1996).

Where a federal question appears on the face of a well-pleaded complaint, federal jurisdiction is not automatic. Federal jurisdiction requires not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum. See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005). The federal issue will qualify for a federal forum if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331. See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313-14.

1.   **Jurisdiction Where Relief Requires Resolution of Federal Issue.**

A plaintiff may not, however, circumvent federal jurisdiction by omitting federal issues that are essential to his or her claim. See Schmeling v. NORDAM, 97 F.3d at 1345 n.2. "A case arises under federal law if its 'well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" Morris v. City of Hobart, 39 F.3d 1105, 1111 (10th Cir. 1994)(quoting Franchise Tax Board v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983)). Thus, even though a plaintiff asserts only claims under state law, federal-question

jurisdiction may be appropriate if the state-law claims implicate significant federal issues.  See Nicodemus v. Union Pacific Corp., 440 F.3d 1227, 1232 (10th Cir. 2006).

### 2.      Substantial and Disputed Federal Question.

Jurisdiction requires more than just a federal question, however: "It is by now axiomatic that 'federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" Nicodemus v. Union Pac. Corp., 440 F.3d at 1232 (quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313).

## LAW REGARDING TITLE VII EMPLOYMENT DISCRIMINATION CASES

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin."[5] Brown v. Gen. Servs. Admin., 425 U.S. 820, 825 (1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).  The Court has noted that Title VII generally protects individuals from employers' improperly motivated adverse treatment in the workplace:

---

[5]The condition of being pregnant was added to this list of protected statuses in 1978.  The Pregnancy Discrimination Act, Pub. L. No. 95-555, 92 Stat. 2076, added the following subsection to 42 U.S.C. § 2000e, the "Definitions" section of Title VII:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.  This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

42 U.S.C. § 2000e(k).

> Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  The Plaintiff may use direct evidence or indirect evidence, with a burden-shifting method, to establish a case under Title VII.

Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(alterations omitted)(quoting 42 U.S.C. § 2000e-2(a)(1))(internal quotation marks omitted).  With the 1972 amendments to the statute, Title VII's protections apply to federal and private employees.  See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)).  The Honorable Lewis F. Powell, Associate Justice of the Supreme Court of the United States, writing for a unanimous Supreme Court of the United States, described the prima facie elements of a Title VII claim[6] and the subsequent burden-shifting:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination.  This may be done by showing (i) that he belongs to a racial minority;[7] (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. . . .
>
> The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.  We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire.  Here petitioner has assigned respondent's participation in unlawful conduct against it as the cause for his rejection.  We think that this suffices to discharge petitioner's burden of proof at this stage and to meet respondent's prima facie case of discrimination.

---

[6]Justice Powell noted, however, that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."  McDonnell Douglas Corp. v. Green, 411 U.S. at 802 n.13.

[7]Non-minority women may sue under the same standard as minorities, and non-minority males may sue subject to a heightened standard.  See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279-80 (1976).

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)(footnotes omitted).

At the motion-to-dismiss stage, however, the plaintiff need not plead facts to state a prima facie case under McDonnell Douglas Corp. v. Green to state a plausible claim for relief:

> [A]lthough the plaintiff need not plead facts that constitute a prima facie case under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), in order to survive a motion to dismiss, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-15 (2002), a civil rights plaintiff retains the burden of alleging facts sufficient to state a claim entitling her to relief.

Harman v. Unisys Corp., 356 F. App'x 638, 640 (D.C. Cir. 2009)(citing Jordan v. Alternative Res. Corp., 458 F.3d 332, 346-47 (4th Cir. 2006)).  See Gerald v. Locksley, 849 F. Supp. 2d 1190, 1221 (D.N.M. 2011)(Browning, J.)("A civil rights plaintiff need not plead facts that constitute a prima facie case under the framework of McDonnell Douglas Corp. v. Green . . . to survive a motion to dismiss.  Nevertheless, the plaintiff retains the burden to allege facts sufficient to state all the elements of her claim."  (alterations omitted)(quoting Prince-Garrison v. Md. Dep't of Health and Mental Hygiene, 317 F. App'x 351, 353 (4th Cir. 2009))(internal quotation marks omitted)).  See also Messina v. Kroblin Transp. Sys., Inc., 903 F.2d 1306, 1308 (10th Cir. 1990)("McDonnell Douglas inferences provide assistance to a judge as he addresses motions to dismiss, for summary judgment, and for directed verdict.").  Before filing suit in federal court, a Title VII claimant must generally exhaust his or her administrative remedies by filing a charge with the EEOC.  See Khader v. Aspin, 1 F.3d 968, 970 (10th Cir. 1993).  The claimant need not, however, have obtained a favorable finding from the EEOC to file suit, and may proceed on his or her Title VII suit despite an adverse finding from the EEOC.  See McDonnell Douglas Corp. v. Green, 411 U.S. at 798-99.

1.     **The Injury Element of Title VII: Materially Adverse Employment Actions**.

The "injury" element of a Title VII claim is satisfied by showing that the claimant's employer subjected him or her to a "materially adverse employment action," which the Tenth Circuit has defined expansively. See Orr v. City of Albuquerque, 417 F.3d at 1150 ("Because of the remedial nature of Title VII lawsuits, we broadly define adverse employment action."). The Tenth Circuit has stated:

> Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a case-by-case approach; examining the unique factors relevant to the situation at hand. Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action.

Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998)(internal quotation marks and citations omitted). See Proctor v. United Parcel Serv., 502 F.3d at 1208. An adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010)(quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68)(internal quotation marks omitted). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms."). "We construe the phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of wages or benefits.'" Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 (quoting Annett

- 24 -

v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004)).  Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although "a mere inconvenience or an alteration of job responsibilities will not suffice."   Annett v. Univ. of Kan., 371 F.3d at 1239 (citation omitted)(internal quotation marks omitted).

In Anderson v. Clovis Municipal Schools, 265 F. App'x 699 (10th Cir. 2008)(unpublished),[8] the Tenth Circuit addressed the requirement of an adverse employment action in the context of a disparate-treatment claim where an employee, who had been placed on a growth plan,[9] alleged other harsh treatment and a written reprimand in support of his claim that

---

[8]Anderson v. Clovis Municipal Schools is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Anderson v. Clovis Municipal Schools, as well as Welsh v. City of Shawnee, 182 F.3d 934 (10th Cir. 1999), Echols v. Today's Staffing, 35 F. App'x 776 (10th Cir. 2002), Atkins v. Southwestern Bell Co., 137 F. App'x 115 (10th Cir. 2005), Showalter v. Weinstein, 233 F. App'x 803 (10th Cir. 2007), Carter v. Mineta, 125 F. App'x 231 (10th Cir. 2005), Mitchell v. City & County of Denver, 112 F. App'x 662 (10th Cir. 2004), Walker v. United Parcel Service of America, 76 F. App'x 881 (10th Cir. 2003), Robinson v. Cavalry Portfolio Serv., LLC, 365 F. App'x 104 (10th Cir. 2010), Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011), and Suazo v. Regents of Univ. of Cal., 149 F.3d 1191, at *2 (10th Cir. 1998), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

[9] The Tenth Circuit explained:

> The plan at issue was reflected in a five-page document, which generally detailed: (1) areas in which [the plaintiff's supervisor] thought Anderson needed to improve, (2) a proposed timeline for the noted improvements, (3) ways in which

he suffered a hostile work environment.  Relying on Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999), the plaintiff, Anderson, argued that the growth plan and formal reprimand rose to the level of an adverse employment action under Tenth Circuit law.  In discussing Anderson v. Clovis Mun. Sch.'s reliance on Schuler v. City of Boulder, the Tenth Circuit stated: "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit."  MacKenzie v. City and Cnty. of Domier, 414 F.3d 1266, 1279 (10th Cir. 2005).  See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2007)(explaining that Title VII proscribes only discriminatory conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects [the employee's] status as an employee" (internal quotation marks omitted)).  "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action."  Robinson v. Cavalry Portfolio Serv., LLC, 365 F. App'x 104, 114 (10th Cir. 2010)(unpublished)(quoting Haynes v. Level 3 Commc'ns, 456 F.3d at 1218-19).

---

Anderson's progress would be measured, and (4) resources at Anderson's disposal to assist him in meeting the identified goals.  Anderson immediately rejected the growth plan because, in his opinion, it was unnecessary as he was already in compliance with his duties as a special education teacher and there were no problems with his performance.  He admitted at his deposition that he did not cooperate with [his supervisor] during the growth plan process and that he did not make any extra effort to accomplish the goals set forth in the plan.

Anderson v. Clovis Mun. Sch., 265 F. App'x at 701.

2.      **The Exhaustion Requirement.**

"Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII." Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996)(internal quotation marks omitted). Exhaustion of administrative remedies is central to Title VII's statutory scheme, because it provides the EEOC with the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and of promoting conciliatory efforts. See Patterson v. McLean Credit Union, 491 U.S. 164, 180-81 (1989); Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994). "'[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.'" Welsh v. City of Shawnee, 182 F.3d 934, at *2 (10th Cir. 1999)(unpublished table decision)(quoting Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989)).

To exhaust administrative remedies, an individual claimant must: (i) first and timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge; and (ii) receive notice of the right to sue. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999); 42 U.S.C. § 2000e-5(b), (c), (e), (f)(1). "[A] plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue letter." Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d at 1321. Once an individual receives notice of the right to sue, he or she has ninety days in which to file suit. See 42 U.S.C. § 2000e-5(f)(1). "[A]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the

- 27 -

allegations." Welsh v. City of Shawnee, 182 F.3d at *5.  See Rush v. McDonald's Corp., 966 F.2d 1104, 1110-11 (7th Cir. 1992)(noting the plaintiff's EEOC affidavit contained "explicit reference" to discrimination alleged in the complaint); Box v. A&P Tea Co., 772 F.2d 1372, 1375 (7th Cir. 1985)(noting that handwritten addendum to typed charge of race discrimination, also suggesting sex discrimination, was sufficient to permit a judicial claim).

The filing of a timely charge of discrimination with the EEOC is a jurisdictional prerequisite to the institution of a lawsuit based on a claim of employment discrimination under Title VII.  See Keller v. Prince George's Cnty, 827 F.2d 952, 956 (4th Cir. 1987); Romero v. Union Pac. R.R., 615 F.2d 1303, 1303 (10th Cir. 1980)(quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974)).  Without such a filing, federal courts lack subject-matter jurisdiction to entertain Title VII claims, and a rule 12(b)(1) motion to dismiss is procedurally proper.  See Seymore v. Shawyer & Sons, Inc., 111 F.3d 794, 799 (10th Cir. 1997); Carmody v. SCI Colo. Funeral Servs., Inc., 76 F. Supp. 2d 1101, 1103-04 (D. Colo. 1999).

Before 2002, the Tenth Circuit recognized a limited exception to the "exhaustion rule for Title VII claims when the unexhausted claim is for discrimination like or reasonably related to the allegations of the EEOC charge."  Simms v. Oklahoma ex. rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d at 1327 (citations omitted)(internal quotation marks omitted). The Tenth Circuit "construed the 'reasonably related' exception to include most retaliatory acts subsequent to an EEOC filing."  165 F.3d at 1327 (citing Seymore v. Shawyer & Sons, Inc., 111 F.3d at 799).  In Martinez v. Potter, 347 F.3d 1208 (10th Cir. 2003), however, the Tenth Circuit noted that the "Supreme Court's pronouncement in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), has effected fundamental changes to the doctrine allowing

administratively unexhausted claims in Title VII actions."  347 F.3d at 1209.  The Tenth Circuit stated:

> We agree with the government that such unexhausted claims involving discrete employment actions are no longer viable.  Morgan abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted.

Martinez v. Potter, 347 F.3d at 1209 (citations omitted)(internal quotation marks omitted).

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 114 (citations omitted)(internal quotation marks omitted).   In National Railroad Passenger Corp. v. Morgan, this rule applied to bar a plaintiff from suing on claims for which no administrative remedy had been sought when those incidents complained of occurred more than 300 days before the filing of Plaintiff's EEO complaint.  See Martinez v. Potter, 347 F.3d at 1210.  "The rule is equally applicable, however, to discrete claims based on incidents occurring after the filing of Plaintiff's EEO complaint."  347 F.3d at 1210.  The Tenth Circuit has stated: "Our decisions have unambiguously recognized Morgan as rejecting application of the continuing violation theory."  Martinez v. Potter, 347 F.3d at 1211.

"A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  MacKenzie v. City & Cnty. of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005).  See Jones v. Sumser Ret. Vill., 209 F.3d 851, 853 (6th Cir. 2000)(noting that "the facts alleged in the charge must be sufficiently related to the claim such that those facts would prompt an investigation of the claim.").  "We liberally construe charges filed with the EEOC in determining

whether administrative remedies have been exhausted as to a particular claim." Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1186 (10th Cir. 2007). "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim." 502 F.3d at 1186. "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." 502 F.3d at 1186 (citing Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1260 (10th Cir. 1998)). "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." Jones v. United Parcel Serv., Inc., 502 F.3d at 1186.

In Jones v. United Parcel Service, Inc., Jones filed suit against the United Parcel Service for discrimination based on disability, retaliation and failure-to-accommodate. See 502 F.3d at 1186. Jones was a package car driver. See 502 F.3d at 1180. One of the requirements of a driver was to be able to lift a package weighing up to seventy pounds overhead. See 502 F.3d at 1180. Jones injured his shoulder at work. See 502 F.3d at 1180. Dr. Legler, UPS' company doctor, examined Jones and released him to work modified duty on the condition that he limit his lifting to twenty pounds. See 502 F.3d at 1180. Because of his lifting restrictions, UPS told Jones he could no longer work for UPS. See 502 F.3d at 1180. Jones contacted his union representative who suggested that Jones be examined by another doctor. See 502 F.3d at 1180. Jones followed this advice and was reexamined by his own doctor, who said Jones was able to return to work as a package car driver without restrictions. See 502 F.3d at 1180. Before returning to work, a UPS doctor had to approve Jones. See 502 F.3d at 1180. The UPS doctor -- a doctor different from the one who originally imposed restrictions -- determined that Jones could return to work without restrictions, but then was later contacted by another UPS employee informing him that another doctor had previously placed a permanent restriction on Jones and

asked the doctor to change the restriction.  See 502 F.3d at 1180.  The doctor then changed the

restriction, which precluded Jones from working for UPS.  See 502 F.3d at 1180.  Jones filed a

grievance with the union regarding UPS' refusal to return him to work.  See 502 F.3d at 1180.  A

panel heard Jones' grievance and determined that Jones should get a third doctor's opinion.  See

502 F.3d at 1180.  UPS told the third doctor that he was to solely base his medical opinion on

past medical records and not a new examination.  See 502 F.3d at 1182.  Thus, using only Jones'

past medical records, the doctor opined that he could not perform the essential functions of a

package car driver.  See 502 F.3d at 1182.  Jones filed an additional grievance with the union and

an intake questionnaire with the EEOC, alleging that UPS discriminated against him.  See 502

F.3d at 1182.  On the EEO questionnaire, Jones checked "no" to the questions "[d]o you believe

that the employer regarded you as disabled?" and "did you advise you employer that you

required an accommodation?"  502 F.3d at 1186-87.  Jones also failed to check the box on the

questionnaire indicating that he suffered discrimination on the basis of race and failed to check

one of the two boxes indicating he was bringing a claim of retaliation.  See 502 F.3d at 1186-87.

Jones checked, however, the box for disability on a different page of the form indicating that his

managers made statements prejudicing him regarding race.  See 502 F.3d at 1186.  Jones also

filled out a portion of the questionnaire that he was instructed to answer only if he believed he

was not hired because of a disability.  See 502 F.3d at 1187.  In the narrative portion of the

questionnaire, Jones described the discriminatory conduct as follows: "Injured on 10/6/03.  On

12-4/-3 Dr. Stech-Schulte placed permanent restriction on me, On 2-3-04 Dr. Michael J. Poppa

release[d] me to return to full duty, On 2-9-04 Dr. Legler release[d] me to return to full duty.

After UPS contacted Dr. Legler, Dr. Legler changed restriction on 2/9/04."  502 F.3d at 1187.

The Tenth Circuit held that Jones' questionnaire constituted a charge and that the facts alleged in

his charge created a situation where an administrative investigation of his claim of discrimination based on disability and his claim of retaliation could have reasonably been expected to follow. See 502 F.3d at 1186.

The Tenth Circuit held in Jones v. United Parcel Service, Inc. that Jones' allegations that UPS interfered with a medical evaluation to ensure Jones was not released to return to work, that UPS did not permit Jones to return to work despite releases from two doctors, and that Jones checked a box for retaliation, should have triggered an administrative investigation into whether UPS discriminated against Jones because he was disabled and whether UPS retaliated against him. See 502 F.3d at 1187. Thus, the Tenth Circuit held that Jones had properly exhausted his claims of discrimination based on disability and his claim of retaliation. See 502 F.3d at 1187. The Tenth Circuit held that Jones' claim of failure-to-accommodate, however, was not within the scope of his administrative charge. See 502 F.3d at 1187. Because Jones checked "no" in response to the question whether he advised his employer he needed accommodation and because the text of the charge did not contain facts that would prompt an investigation of such a claim, the Tenth Circuit held that Jones did not exhaust his administrative remedies with respect to that claim. 502 F.3d at 1187.

In Echols v. Today's Staffing, 35 F. App'x 776 (10th Cir. 2002)(unpublished), the Tenth Circuit held that, because Echols' EEOC charge provided no suggestion of a racial discrimination theory, the district court properly dismissed such a theory for failure to exhaust administrative remedies. See 35 F. App'x at 777. Echols filed a charge with the EEOC alleging that he had been subjected to discrimination based on gender and sexual harassment while on a temporary work assignment. See 35 F. App'x at 777. In the charge, the plaintiff checked only the box marked "sex" discrimination. See Echols v. Today's Staffing, No. CIV.A.00-2061CM,

2001 WL 1665380, at *2 (D. Kan. 2001).  In the narrative portion of his charge, Echols similarly

asserted only gender-related discrimination.  See 2001 WL 1665380, at *2 (Echols wrote: "I

believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of

1964, as amended, by being sexually harassed by one of the company's supervisors.  She

harassed me and other employees who worked for the company, males and females.").  The

EEOC dismissed the charge and issued a right-to-sue letter.  See Echols v. Today's Staffing, 35

F. App'x at 777.  Echols then filed a complaint in federal district court, alleging racial

discrimination.  See 35 F. App'x at 777.  "When asked in the complaint to provide the facts

surrounding his claim of discrimination, plaintiff wrote, '[b]y being harassed by the company

employee, by being ignored when complaining about the harassment.'"  Echols v. Today's

Staffing, 2001 WL 1665380, at *2.  Echols contended that, "because he referred to his race and

that of others in his EEOC affidavit, he should not be excluded from alleging racial motive in

this lawsuit.  At the same time, plaintiff admits that the gravamen of his EEOC allegations relate

to sexual, rather than racial, discrimination and harassment."  Echols v. Today's Staffing, 2001

WL 1665380, at *2.  In reviewing the plaintiff's EEOC affidavit, the district court found

reference to "plaintiff's racial identity only where plaintiff responded to a question on the

affidavit form.  In the narrative portion, plaintiff did refer to the racial identity of several others,

but significantly omitted any reference to the race of the alleged 'harasser.'"  2001 WL 1665380,

at *2.  The district court also noted that Echol's EEOC affidavit states that two other employees,

one white and one African American, also complained of the "harasser's" conduct.  2001 WL

1665380, at *2.  The district court held that "[s]uch a statement negates any inference of racial

discrimination by alleging instances where both whites and blacks were being sexually

harassed," and suggests that he only referred to the race of his fellow employees for

identification purposes.  2001 WL 1665380, at *2.  Thus, the district court held that there were no statements in the narrative portion of plaintiff's EEOC charge to rebut his failure to check the race box and justify an inference of race discrimination.  See 2001 WL 1665380, at *2.  The Tenth Circuit affirmed the district court's decision, holding that Echol's EEOC charge provided no suggestion of his racial discrimination theory, and thus agreed that his claim of racial discrimination should be dismissed.  See Echols v. Today's Staffing, 35 F. App'x at 777.

In Duncan v. Manager Department of Safety, 397 F.3d 1300 (10th Cir. 2005), a former police officer filed an EEOC charge against the city on April 14, 1998 and checked the box for retaliation.  See 397 F.3d at 1314.  The former officer alleged a series of acts before the date the EEOC charge was filed that were supposedly in retaliation for her use of the complaint process. See 397 F.3d at 1314.  The Tenth Circuit held that none of the actions that the former officer alleged in her EEOC charge were sufficient to support a retaliation claim.  See 397 F.3d at 1314. The Tenth Circuit noted that, in her complaint filed in federal court, the former officer alleged an act that was severe enough to support a retaliation claim.  See 397 F.3d at 1314.  She alleged that she was transferred to the police academy in retaliation for filing her original EEOC charge.  See 397 F.3d at 1314.  The Tenth Circuit noted, however, that, because the former officer did not file an additional EEOC charge alleging that specific retaliatory act, she did not exhaust her administrative remedies and thus the district court correctly dismissed her claim for retaliation. See 397 F.3d at 1314.

In Annett v. University of Kansas, 371 F.3d 1233 (10th Cir. 2003), the Tenth Circuit declined to consider Annett's contention that receiving the position of adjunct lecturer versus adjunct professor constituted a retaliation action, because she failed to exhaust her administrative remedies.    See  371  F.3d  at  1238.    The  Tenth  Circuit  considered  Annett's  charge  of

discrimination filed September 6, 2000, and her "complaint narrative" submitted on May 31, 2000, and found no reference to the distinction between "lecturer" and "professor" as probative of discrimination or retaliation. 371 F.3d at 1238. Annett's complaint stated: "I was given an adjunct faculty position, but no Principal Investigator status, which prevents me from obtaining grants." 371 F.3d at 1238. Annett's complaint narrative stated: "My own position as an Adjunct Faculty member at KU was downgraded to prevent me from submitting grants that could act as an alternative source of income." 371 F.3d at 1238. The Tenth Circuit held that it could not conclude "that this sentence represents the distinction between being appointed an adjunct lecturer versus an adjunct professor in 1999 or 2000." 371 F.3d at 1238. Furthermore, the Tenth Circuit noted that it "lack[ed] jurisdiction to review Title VII claims that are not part of a timely-filed EEOC charge." 371 F.3d at 1238 (citing Seymore v. Shawver & Sons, Inc., 111 F.3d at 799).

> Previously, we would proceed to examine whether the alleged employment action, provided it occurred after the filing of the EEOC charge, was "like or reasonably related to the allegations of the EEOC charge." Ingels v. Thiokol Corp., 42 F.3d 616, 625 (10th Cir. 1994). However, our recent holding in Martinez v. Potter has foreclosed this line of inquiry. In Martinez, we abrogated the continuing violation exception to our jurisdictional requirements to allege a claim of retaliation and held that "unexhausted claims involving discrete employment actions are no longer viable." 347 F.3d at 1210. In so doing, we relied on National R.R. Passenger Corp. v. Morgan, which concluded that each discrete retaliatory action constitutes its own unlawful employment practice for which administrative remedies must be exhausted, and we applied Morgan to incidents occurring after an employee's filing of an EEO complaint.

Annett v. Univ. of Kan., 371 F.3d at 1238 (citations omitted)(internal quotation marks omitted). Thus, the Tenth Circuit dismissed Annett's claim for failure to exhaust administrative remedies.

In Atkins v. Southwestern Bell Co., 137 F. App'x 115 (10th Cir. 2005)(unpublished), the Tenth Circuit held that Atkins failed to exhaust her retaliation claim by not including the claim in her formal charge filed with the EEOC. See 137 F. App'x at 118. Atkins provided the EEOC

with an intake questionnaire and a sworn supporting affidavit before submitting her formal charge. See 137 F. App'x at 118. The Tenth Circuit stated that, even "assuming for purposes of this appeal that Plaintiff's intake questionnaire and sworn supporting affidavit could be deemed the equivalent of a formal charge," because "[p]laintiff's formal charge, filed approximately ten months after she submitted her intake questionnaire, did not include any indication that she wished to pursue a retaliation claim or describe any facts that would support such a claim," she had not exhausted her administrative remedies. 137 F. App'x at 118. The Tenth Circuit held that the omission of such claims in the later-filed formal charge indicated that Atkins had abandoned this claim. See 137 F. App'x at 118. Thus, the Tenth Circuit held that Atkins had not exhausted her administrative remedies. See 137 F. App'x at 118.

In Showalter v. Weinstein, 233 F. App'x 803 (10th Cir. 2007), Showalter asserted that the district court erroneously concluded that she did not exhaust her administrative remedies for her claims not expressly stated in her EEOC charge. See 233 F. App'x at 807. The National Archives and Records Administration employed Showalter as a GS-11 Team Lead from October, 2001 to May, 2002 when she was terminated from her employment. See 233 F. App'x at 804. Showalter, her supervisor, and another employee participated in an internal office mediation with a professional facilitator. See 233 F. App'x at 804. After tension among the three increased, Showalter contacted an EEO counselor by electronic mail and by telephone. See 233 F. App'x at 804. On May 15, 2002, Showalter received a letter advising her that her employment was terminated because of unsatisfactory performance during her probationary period. See 233 F. App'x at 804-805. On May 20, 2002, she spoke with the EEOC counselor again, stating that she believed she was being fired as a result of her contact with the EEO counselor. See 233 F. App'x at 805. On June 4, 2002, the counselor issued a Notice of Final Interview/Right to File

a Formal Complaint of Discrimination, stating that Showalter alleged she suffered discrimination based on reprisal.  See 233 F. App'x at 805.  On June 24, 2002, Showalter filed a timely formal EEO complaint.  See 233 F. App'x at 805.  On the face of the complaint, she checked the box next to "Reprisal," but did not check any of the other seven boxes.  See 233 F. App'x at 805. She also identified May 15, 2002, the day on which she received her termination letter, as the date of discrimination.  See 233 F. App'x at 805.  Showalter also attached to her complaint a letter and a long statement explaining that her formal complaint of discrimination was based on "reprisal for participation in protected EEO activity."  233 F. App'x at 805.  On July 12, 2002, Showalter submitted a one-sentence letter to the EEO office stating: "I would like to amend my complaint . . . to include as additional bases of discrimination my disability (Crohn's disease; my gender (female); and my race (white, Caucasian)."  233 F. App'x at 805.  An EEO counselor spoke to Showalter on November 5, 2002 about her letter.  See 233 F. App'x at 805.  The EEO counselor then issued an amended counseling report saying that the issues Showalter alleges took place were not discussed during the initial counseling period.  See 233 F. App'x at 805.  On January 3, 2003, the National Archives and Records Administration sent Showalter's counsel a letter indicating that it had identified two issues for investigation: (i) whether Showalter was subjected to a hostile-work environment based on her disability, sex, and/or race; and (ii) whether she was terminated based on reprisal for contacting an EEO counselor.  See 233 F. App'x at 805.  Showalter subsequently filed a complaint in district court.  See 233 F. App'x at 805.  The district court held that Showalter's EEO complaint asserted a claim only for reprisal and that her long statement was just an explanation of the details leading up to her termination. See 233 F. App'x at 805.  "The court noted that the EEO counselor characterized Ms. Showalter's July 12 attempted amendment as a claim for hostile work environment," and

that, because her race, gender, and disability discrimination claims were not like or related to her original reprisal claim, the amendment did not relate back to her original formal complaint. 233 F. App'x at 805-806. "When an amendment advances a new theory of recovery and the amendment is not like or related to the original claim, regardless of whether it is based on incidents described in the original claim," the amendment does not relate back. See 233 F. App'x at 806.

On appeal in Showalter v. Weinstein, Showalter alleged that the "proper inquiry in exhaustion cases is whether the agency received adequate notice of the claims." 233 F. App'x at 806. Showalter relied on dicta from Richardson v. Frank, 975 F.2d 1433 (10th Cir. 1991), a case that the Tenth Circuit believed had readily distinguishable facts. See 233 F. App'x at 807. Citing from Richardson v. Frank, Showalter argued that "Title VII is remedial legislation to be construed liberally rather than technically" and that "[t]he procedural requirements of Title VII should not be allowed to become so formidable and inflexible as to preclude the aggrieved employee from receiving relief from employment discrimination." 233 F. App'x at 807. The Tenth Circuit pointed out that Showalter

> overlook[ed] . . . the context in which this court made the foregoing statements -- they were made while the court considered the then-applicable thirty-day time limit within which an aggrieved employee was required to bring his or her claim to the attention of an EEO counselor. Specifically, the court in Richardson observed that plaintiff's untimely filing was not a jurisdictional bar, acknowledged that his circumstances may warrant equitable tolling of the applicable time limitations, and rejected the district court's construction of "bring to the attention" to mean "file." The court then made the statements upon which Ms. Showalter relies and held that whether plaintiff's circumstances warranted equitable tolling was a factual determination that prevented the grant of summary judgment. . . . Read in context then, that portion of Richardson relied upon by Ms. Showalter does not support a holding that she exhausted claims one, two, four, and that portion of claim three that did not pertain to retaliatory discharge because her former employer had timely notice of each of those claims. To accept Ms. Showalter's position, that notice is all it takes to satisfy the

requirements of exhaustion, would be tantamount to ignoring the applicable regulatory framework.

Showalter v. Weinstein, 233 F. App'x at 807.

In Denetclaw v. Thoutt Bros. Concrete Contractors, Inc., No. 06-CV-00618-WDM-MJW, 2007 WL 2909391 (D. Colo. Sept. 30, 2007), a federal district court in Colorado determined whether Denetclaw's EEOC charge was sufficient to constitute exhaustion of his administrative remedies.  See 2007 WL 2909391, at *5.  In Denetclaw's second EEOC charge, he stated that he was discriminated against on account of his race (Native American), his age (53), and his sex (male) and checked the boxes for race, age and sex discrimination.  See 2007 WL 2909391, at *5.  Denetclaw also alleged that he was subjected to a hostile work environment and "injun remarks," and "told to do an Indian rain dance" on hot days.  2007 WL 2909391, at *5.  The charge listed the date of the discrimination, but did not specifically list any of the parties involved.  See 2007 WL 2909391, at *5.  The district court held that, because Denetclaw failed to identify the parties, give pertinent dates, or generally describe the practices at issue, he did not exhaust his administrative remedies regarding his hostile environment claim.  See 2007 WL 2909391, at *5.  Furthermore, the court noted that the charge allegations do not provide sufficient notice to the EEOC to investigate the claim of hostile work environment.  See 2007 WL 2909391, at *5.

3.      **"Reverse Discrimination" Claims.**

Title VII "proscribe[s] racial discrimination . . . against whites on the same terms as racial discrimination against nonwhites."  McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279-80 (1976).  In these reverse discrimination cases, the protected-class requirement for a prima facie case under McDonnell Douglas Corp. v. Green is substituted for the requirement that the plaintiff show facts to support an inference that "the defendant is one of those unusual employers

who discriminates against the majority." Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir. 1992). See Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1149 (10th Cir. 2008)("When plaintiff is a member of a historically favored group, by contrast, an inference of invidious intent is warranted only when 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" (quoting Notari v. Denver Water Dept., 971 F.2d at 589)).

### 4.    Hostile Work Environment Claims.

To establish a prima facie case of hostile work environment harassment, a plaintiff must show that, "under the totality of circumstances": (i) "the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment"; and (ii) "the harassment was racial or stemmed from racial animus." Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998). See Carter v. Mineta, 125 F. App'x 231, 238 (10th Cir. 2005)(unpublished); Mitchell v. City & Cnty. of Denver, 112 F. App'x 662, 671 (10th Cir. 2004)(unpublished). To establish a hostile-work-environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998)(citations omitted)(internal quotation marks omitted). "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for her to continue." Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir. 1996)(holding that a work environment did not contain "pervasive" harassment when the plaintiff made general allegations of frequent "sexual slurs" and the only specific incident cited involved a co-worker grabbing the plaintiff).

"The mere utterance of a statement which 'engenders offensive feelings in an employee' would not affect the conditions of employment to a sufficient[ly] significant degree to violate Title VII.'"  Gross v. Burggraf Construction Co., 53 F.3d 1531, 1537 (10th Cir. 1995)(alteration in original)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).   A plaintiff must allege more than "'a few isolated incidents of racial enmity' or 'sporadic racial slurs.'"  Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005)(citation omitted)(quoting Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994)).   "Instead, 'there must be a steady barrage of opprobrious racial comments.'"  Chavez v. Mexico, 397 F.3d at 832 (quoting Bolden v. PRC, Inc., 43 F.3d at 551).

The Tenth Circuit has stated that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile-work-environment claim. Witt v. Roadway Express, 136 F.3d at 1432 (addressing a hostile-work-environment claim under 42 U.S.C. § 1981).  See Aramburu v. Boeing Co., 112 F.3d 1398, 1410 (10th Cir. 1997)(citing Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994))(noting that "standards and burdens under § 1981 are the same as those under Title VII").   Moreover, the plaintiff must demonstrate that the work environment was objectively and subjectively offensive, but need "not demonstrate psychological harm, nor . . . show that her work suffered as a result of the harassment."   Walker v. United Parcel Serv. of Am., 76 F. App'x 881, 885 (10th Cir. 2003)(unpublished).  In addition to all the circumstances, relevant considerations to determine if an environment is objectively hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   Faragher v. City of

Boca Raton, 524 U.S. 775, 787-88 (1998)(quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21)(internal quotation marks omitted).

     **5.**     **Disparate Treatment Claims.**

     "To prevail on a disparate treatment claim under Title VII of the Civil Rights Act, a plaintiff must show that [the] employer intentionally discriminated against [the plaintiff] for a reason prohibited by the statute." Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1306 (10th Cir. 2005). To do so, courts apply the burden-shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), which initially places the burden on the plaintiff to prove a prima facie case of discrimination. See, e.g., EEOC v. PVNF, LLC, 487 F.3d 790, 800-01 (10th Cir. 2007).

     The elements laid out in McDonnell Douglas Corp. v. Green to prove a prima facie disparate treatment prima facie case addressed only a refusal to rehire. Accordingly, the articulation of a plaintiff's prima facie case "varies depending on the type of adverse action the employee alleges was discriminatory." EEOC v. PVNF, LLC, 487 F.3d at 800 (citing Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005)). See 1 Lex K. Larson, Employment Discrimination § 8.08[1], at 8-103 (2d ed. 2012)("[C]ourts have applied the McDonnell Douglas prima facie case, sometimes modifying the proof requirements to fit the specific facts of the case, to cases involving promotion, discharge, demotion, discipline, layoffs, and other types of employer actions."). Generally, to prove a disparate-treatment discrimination claim at the summary-judgment stage, "a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." EEOC v. PVNF, LLC, 487 F.3d at 800. See Sorbo v. United Parcel Serv., 432

F.3d 1169, 1173 (10th Cir. 2005)(holding that a "prima facie case for discrimination" requires the "plaintiff to show that (1) he belongs to the protected age group; (2) his job performance was satisfactory; (3) adverse employment action was taken against him; and (4) comparable employees who were not in a protected class did not receive comparable adverse employment action." (citations omitted)(internal quotation marks omitted)); Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002)); Jones v. Denver Post Corp., 203 F.3d 748, 753 (10th Cir. 2000)("A prima facie case of disparate discipline may be established if the plaintiff proves by a preponderance of the evidence that (1) the plaintiff is a racial minority, (2) the plaintiff was disciplined by the employer, and (3) the employer imposed the discipline under circumstances giving rise to an inference of racial discrimination."). Cf. Mathews v. Denver Newspaper Agency LLP, 649 F.3d 1199, 1208 (10th Cir. 2011)("[The plaintiff] bears the initial burden of . . . presenting evidence that (i) he is a member of a protected class, (ii) he was qualified for the job as Unit Supervisor, (iii) he was demoted from that job, and (iv) the position was not eliminated." (citing Jones v. Denver Post Corp., 203 F.3d at 753)).[10]

---

[10]The Court has previously written: "To establish a prima-facie case of discrimination, a plaintiff must demonstrate that: (i) she is a member of a protected class; (ii) she suffered an adverse-employment action, and (iii) similarly situated employees were treated differently." Gerald v. Locksley, 785 F. Supp. 2d at 1099. The Court cited to the Tenth Circuit's August, 2005 decision in Orr v. City of Albuquerque, in which the Tenth Circuit stated: "To make out a prima facie case of discrimination, the female Plaintiffs must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." Orr v. City Of Albuquerque, 417 F.3d at 1149. Only a few months after Orr v. City of Albuquerque, in December, 2005, the Tenth Circuit held that the district court's inclusion in the plaintiff's prima facie case of a showing that "comparable employees who were not in a protected class did not receive comparable adverse employment action" was the "recitation of an outmoded prima facie case test," and that showing disparate treatment of similarly situated individuals is only one way to prove the third McDonnell Douglas element. Sorbo v. United Parcel Serv., 432 F.3d at 1173. The Tenth Circuit recognized that the proper third element is -- and had been since at least 1999 -- the broader prima facie requirement that the defendant took the adverse employment action under "circumstances giving rise to an inference of discrimination." Sorbo v. United Parcel Serv., 432 F.3d at 1173 (citing Perry v.

6.      **Disparate Impact Claims**.

"Title VII forbids not only intentional discrimination based on disparate treatment but also 'practices that are fair in form, but discriminatory in operation,' most often referred to as 'disparate impact' discrimination."   Tabor v. Hilti, Inc., 703 F.3d 1206, 1220 (10th Cir. 2013)(quoting Lewis v. City of Chicago, Ill., 560 U.S. 205, 211-12 (2010)).   More specifically, disparate impact cases "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."   Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

---

Woodward, 199 F.3d 1126, 1135-40 (1999); Salguero v. City of Clovis, 366 F.3d at 1175; Plotke v. White, 405 F.3d at 1101; Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d at 1181; Jones v. Denver Post Corp., 203 F.3d at 753).   It noted that, "[w]hile this broader requirement may be (and often is) satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case."   432 F.3d at 1173.   At the same time, the Tenth Circuit pointed out that its precedent has been inconsistent on whether a prima facie discrimination case requires showing similarly situated individuals were treated more favorably: "As noted in Jaramillo v. Colo. Judicial Department, 427 F.3d at 1307 n.1 (10th Cir. 2005), this court's own jurisprudence has not been entirely consistent in this regard."   Sorbo v. United Postal Serv., 432 F.3d at 1173 n.4 (citing, e.g., MacKenzie v. City & Cnty. of Denver, 414 F.3d at 1277).

Similarly, in the context of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), which also applies the McDonnell Douglas Corp. v. Green prima facie case framework, the Supreme Court declared: "Because it lacks probative value, the fact that a[] . . . plaintiff was replaced by someone outside the protected class is not a proper element of the McDonnell Douglas prima facie case."   O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996).   The Supreme Court held that "the proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'"   517 U.S. at 312-13 (emphasis omitted)(quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)).

The Court therefore concludes that its articulation in Gerald v. Locksley of the McDonnell Douglas Corp. v. Green prima facie elements of discrimination, which was based on the Tenth Circuit's decision in Orr v. City Of Albuquerque, is not the best statement of the law today.   Title VII plaintiffs need not demonstrate that similarly situated employees were actually treated differently, but only circumstances that give rise to an inference of discrimination.

'''The first step in raising a disparate-impact claim is to identify the specific employment practice allegedly causing the discriminatory impact.'" Tabor v. Hilti, Inc., 703 F.3d at 1221 (quoting Carpenter v. Boeing Co., 456 F.3d 1183, 1193 (10th Cir. 2006)).  To succeed in a disparate impact claim, a plaintiff must prove the existence of an employment practice "that [is] fair in form, but discriminatory in operation."  Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971).  See Carpenter v. Boeing Co., 456 F.3d at 1187 ("[A] plaintiff may establish a prima facie case of disparate impact discrimination by showing that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group."  (alteration in original)(quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1312 (10th Cir. 1999))(internal quotation marks omitted)).  Consequently, in disparate impact cases, unlike disparate treatment cases, proof of discriminatory motive is irrelevant.  See Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1242 (10th Cir. 1991).

The Supreme Court has held that statistical evidence alone is sufficient to establish a prima facie case of disparate impact discrimination.  See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-08 (1977)("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); Tabor v. Hilti, Inc., 703 F.3d at 1222 ("'Statistical evidence is an acceptable, and common, means of proving disparate impact.'"  (quoting Carpenter v. Boeing Co., 456 F.3d at 1202)).  Statistics are not irrefutable, however, and any proffered statistical analysis "must involve the appropriate comparables, and must 'cross a threshold of reliability before it can establish even a prima facie case of disparate impact.'"  Ortega v. Safeway Stores, Inc., 943 F.2d at 1243 (citation omitted)(quoting Allen v. Seidman, 881 F.2d 375, 378 (7th Cir. 1989)).  See Int'l Bhd. of

Teamsters v. United States, 431 U.S. at 340 (noting statistics "come in infinite variety and, like any other kind of evidence, they may be rebutted").

"[F]or statistical evidence to create an inference of discrimination, the statistics must . . . eliminate nondiscriminatory explanations for the disparity."  Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir. 1994)(quoting Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991)).  See Martinez v. Wyoming, 218 F.3d at 1139; Doan v. Seagate Tech., Inc., 82 F.3d 974, 979 (10th Cir. 1996).  "[S]tatistical evidence . . . may be diluted by factors such as an inadequate sample size and failure to consider similarly situated individuals."  Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *9 (D.N.M. Dec. 15, 2006)(Browning, J.)(citing Mayor of Philadelphia v. Educ. Equal. League, 415 U.S. 605, 621 (1974); Martinez v. Wyoming, 218 F.3d 1133, 1138-39 (10th Cir. 2000)).  As a threshold matter, therefore, "[t]he statistics must . . . relate to the proper population.  For example, when the claim is disparate impact in hiring, the statistics should be based on data with respect to persons qualified for the job."  Carpenter v. Boeing Co., 456 F.3d at 1196.  The Tenth Circuit has explained:

> After specifying the employment practice allegedly responsible for excluding members of their protected class from a benefit, plaintiffs must identify the correct population for analysis.  In the typical disparate impact case the proper population for analysis is the applicant pool or the eligible labor pool.  The composition of this population is compared to the composition of the employer's workforce in a relevant manner, depending on the nature of the benefit sought.

Carpenter v. Boeing Co., 456 F.3d at 1196 (quoting Smith v. Xerox Corp., 196 F.3d 358, 368 (2d Cir. 1999)).

Assuming that the statistical evidence canvasses the correct population, the Tenth Circuit recently laid out a three-factor analysis for a disparate-impact prima facie case, holding that the district court must analyze: (i) the size of the disparity between those with the status allegedly

- 46 -

discriminated against and those without the status; (ii) the statistical significance of the disparity, measured by standard error rate or standard deviation; and (iii) whether statistical evidence effectively isolates the challenged employment action.  See Tabor v. Hilti, Inc., 703 F.3d at 1222 (stating that, for a prima facie case of disparate impact against women, "we are concerned with three issues: (1) the size of the disparity between male and female promotions; (2) the statistical significance of the disparity, measured by standard error rate or standard deviation; and (3) whether the statistical evidence effectively isolates the challenged employment practice").  In relation to the first factor, the size of the disparity between those with the status alleged to be the basis of discrimination versus those without the status should usually be at least twenty percent to be independently persuasive.  See Tabor v. Hilti, Inc., 703 F.3d at 1222 (noting that the EEOC "guidelines provide that a disparity of 20% or more in selection rate will be considered evidence of adverse impact in a disparate impact claim" and that, "[a]lthough not controlling on courts, this guideline is persuasive").  As to the second factor -- the statistical significance of the disparity -- both the Tenth Circuit and "'[t]he Supreme Court ha[ve] recognized that a disparity of more than two or three standard deviations in a large sample makes suspect the contention that the differential occurs randomly.'"  Tabor v. Hilti, Inc., 703 F.3d at 1223 (quoting Carpenter v. Boeing Co., 456 F.3d at 1195)(holding that "Ms. Tabor's evidence was statistically significant at 2.777 standard errors," as to which the plaintiff's expert concluded "the probability is less than 0.006 that a disparity at least as large as this could occur solely as the result of chance factors, if promotions were unrelated to sex").  The third factor -- whether the statistical evidence isolates the challenged adverse employment practice or action -- requires the plaintiff to "isolate[] the specific employment practice by controlling for key factors outside the challenged practice that could potentially cause or contribute to the disparity."  Tabor v. Hilti, Inc., 703 F.3d at 1223

(citing Carpenter v. Boeing Co., 456 F.3d at 1196).  The Tenth Circuit has explained that this factor is "important because it goes directly to causation" and that an employer will not be liable for disparate impact which is caused by circumstances outside of the employer's control.  Tabor v. Hilti, Inc., 703 F.3d at 1223-24 ("An employer will not, for example, be liable for a gender imbalance in its work force that 'is due to a dearth of qualified [female] applicants (for reasons that are not [the employer's] fault).'"  (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 651 (1989))).

### 7.  **Retaliation Claims.**

Employers may not retaliate against employees who make EEOC charges or Title VII claims.  To establish a prima facie case of retaliation, a plaintiff must show: (i) "that he [or she] engaged in protected opposition to discrimination"; (ii) "that a reasonable employee would have found the challenged action materially adverse"; and (iii) "that a causal connection existed between the protected activity and the materially adverse action."  Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202). "To establish that a causal connection exists," a plaintiff "may proffer 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"  Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d at 1228).  Generally speaking, if the protected activity and the adverse action are not "very close in time," the plaintiff "must offer additional evidence to establish causation."  Proctor v. United Parcel Serv., 502 F.3d at 1209 (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d at 1228)(internal quotation marks omitted).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute."   Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See  28 U.S.C. §§ 1331-32.

### 1.      Congressional Authority.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in three common-law doctrines -- pendent, ancillary, and pendent party jurisdictions -- the former two of which survive today.  The term "supplemental jurisdiction" is now used to refer collectively to the doctrines of ancillary jurisdiction and pendent jurisdiction.  28 U.S.C. § 1367, statutorily codifying Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978)(outlining the doctrine of ancillary jurisdiction), and United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966)(outlining the doctrine of pendent jurisdiction), and invalidating Finley v. United States, 490 U.S. 545 (1989)(outlining the now-defunct doctrine of pendent-party jurisdiction).  Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact."

United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties whose insertion into the litigation is not supported by any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n. 18 (1978).

In 1988, the Honorable William H. Rehnquist, Chief Justice of the United States, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at *5 (D.N.M. Nov. 21, 2011)(Browning, J.)(citing 16 James Wm. Moore et al., Moore's Federal Practice § 106.04[5] (Matthew Bender 3d ed.)).   In response to the Committee's findings regarding "pendent" and "ancillary" jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."  Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2.        District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction, not as a litigant's right, but as a matter of judicial discretion.  See Estate of

Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing

City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).   In circumstances where the

supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains

discretion to decline to exercise that jurisdiction.   The traditional analysis, based on the Supreme

Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial

economy, convenience and fairness to litigants" when deciding whether to exercise supplemental

jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates

four factors that the court should consider:

> (1)  the claim raises a novel or complex issue of State law,
>
> (2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)  the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise

supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness,

and comity."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the

district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions

of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian

News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has

indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir.

1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims

only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court,

24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of <u>Gibbs</u> in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."); <u>Palmer v. Hosp. Auth.</u>, 22 F.3d 1559, 1569 (11th Cir. 1994) ("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)."); <u>Bonadeo v. Lujan</u>, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion.  <u>See</u> <u>Gudenkauf v. Stauffer Commc'ns, Inc.</u>, 896 F. Supp. 1082, 1084 (D. Kan. 1995)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." <u>Koch v. City of Del City</u>, 660 F.3d at 1228, 1248 (10th Cir. 2011)(quoting <u>Smith v. City of Enid ex rel. Enid City Comm'n</u>, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when one of the 28 U.S.C. § 1367(c) factors applies.  See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.).  The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction.'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished)(quoting 28 U.S.C. § 1367(c)(3)).

## ANALYSIS

The Court will dismiss Counts II, III, and IV, because Shay has not stated a plausible PDA/Title VII claim; it concludes that Count IV is not a viable claim; and, having dismissed all federal claims in a case removed to federal court solely on the basis of federal-question and supplemental jurisdiction, and not diversity jurisdiction, it will remand the case to state court. Shay's allegations in support of Counts II and III are consistent with unlawful discrimination, but they are also consistent with, and more suggestive of, something far more likely: that she was fired for taking leave from work, a lawful motive for an employer in the absence of affirmative statutory obligations not implicated here.  Her PDA/Title VII claim, thus, does not rise to the level of plausibility.  Count IV is not a valid cause of action, because Executive Order 11246 manifests no intention to impart an actionable right on federal contractor employees, like Shay, as intended third-party beneficiaries to federal contracts.  Last, because the Court would not have had original jurisdiction but for Counts II, III, and IV -- the jurisdiction asserted by the Defendants upon removal was federal question, and they did not and still have not pled diversity

jurisdiction -- and the Court now dismisses those claims, the Court will remand the case to state court.

## I.   THE COURT WILL DISMISS COUNTS II AND III, BECAUSE SHAY HAS NOT STATED A PLAUSIBLE PDA/TITLE VII CLAIM.

Shay's allegations "are so general that they encompass a wide swath of conduct, much of it innocent," because she has not alleged any facts plausibly suggesting that RWC fired her for any reason apart from her decision to take an unauthorized leave of absence from work.  Robbins v. Oklahoma, 519 F.3d at 1247.  As such, she "ha[s] not nudged [her] claims across the line from conceivable to plausible," and the Court will therefore dismiss her claims.  Bell Atl. Corp. v. Twombly, 550 U.S. at 570.

At the outset, the Court will clarify two potentially confusing issues of law.  First, although Shay styles her Complaint as containing two separate claims, one under the PDA and another under Title VII, she alleged only one cause of action: violation of Title VII.  Title VII, as Congress originally passed it, prohibited discrimination on the basis of sex, but it was not clear how that applied to discrimination on the basis of pregnancy.[11]  Congress passed the PDA in 1978 to clarify this issue.  The PDA's effect was to add a new subsection, § 2000e(k), to the "Definitions" section of Title VII, effectively engrafting pregnancy onto the list of Title VII's protected statuses.[12]  It did not create an independent cause of action, and claims for pregnancy

---

[11]As interpreted by the Supreme Court, the pre-PDA Title VII provided very little protection to pregnant women.  Employers could provide disability plans that excluded pregnancy while including other temporary disabilities that presented a similar impediment to job performance.  See Gen. Elec. Co. v. Gilbert, 429 U.S. 125 (1976).  Such practices are no longer permissible because of the PDA's passage.  See, e.g., AT&T Corp. v. Hulteen, 556 U.S. 701 (2009).

[12]The principal section containing the standards of conduct set forth by Title VII is 42 U.S.C. § 2000e-2, which provides:

It shall be an unlawful employment practice for an employer --

discrimination are still pursued through the vehicle of Title VII.  Second, the parties stipulate that RWC is not subject to the obligations of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2612 ("FMLA"), presumably because it is not an "employer" under the FMLA.  See 29 U.S.C. § 2611(4)(A)(i) (limiting covered employers to those "who employ[] 50 or more employees"); Tr. at 46:8-11 (Sanchez)("My understanding is t[hat] RWC is . . . not required to comply with the FMLA in Albuquerque because of the number of employees that they have within a certain radius.  So she did not have that protection.").  RWC's exclusion from FMLA coverage means

---

    (1)    to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

    (2)    to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  There are a number of other provisions, most of which prohibit discrimination "because of" or "on the basis of" the protected classifications.

The PDA added the following subsection to the "Definitions" section of Title VII:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion

42 U.S.C. § 2000e(k).

that the usual requirement that an employer provide twelve weeks of unpaid leave to pregnant employees does not apply.  RWC did not owe Shay any affirmative benefit; its only obligation was to not discriminate against Shay on the basis of her status as a pregnant woman -- to "treat[ her] the same for all employment-related purposes . . . as other persons not so affected [i.e., employees who are not pregnant, but are unable to work for other reasons] but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).

Once the background expectations of the FMLA are pulled away and the applicable standard of conduct is made clear, the weakness of Shay's claims becomes obvious.  Shay alleges that she told her supervisors: (i) "that she was pregnant"; and (ii) "that she intended to take four (4) weeks of . . . leave."  Complaint ¶ 24, at 4.  Shay then alleges ample facts -- first among them, her supervisors' advance warning that she "may not have a job when she returned" from her leave -- in an attempt to show that the Defendants fired her in direct response to this two-part revelation.  Complaint ¶ 25, at 4.  It worked -- at least for the purposes of the motion-to-dismiss: the Court accepts that Shay was subjected to a materially adverse employment action (termination); that Shay's firing was a direct result of her going on a four-week leave from work; that Shay's leave was based on her pregnancy; and that the Defendants knew Shay's leave was based on her pregnancy.  If those were the elements of Shay's cause of action, she would prevail.

Those are not the elements of a PDA/Title VII claim, however.  "[A] prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  EEOC v. PVNF, LLC, 487 F.3d at 800.  Shay has properly pled the first two elements, but the third is lacking.  Although, at the

motion-to-dismiss stage, Shay need only plead facts that give rise to a plausible inference of discrimination,[13] her claim falls short even of that bar.

Shay cannot merely allege that the Defendants fired her for her maternity leave; she must allege that they fired her for her maternity.  Shay has properly pled the former, but those facts are open to two interpretations: (i) that RWC fired Shay because she went from being non-pregnant to pregnant; or (ii) that RWC fired Shay because she went from being working to non-working. The former constitutes a cause of action; the latter is legal under the circumstances.  Shay has not pled any "circumstances giving rise to an inference" that the first explanation is the correct one. EEOC v. PVNF, LLC, 487 F.3d at 800.  Had Wren or Osborne made comments to Shay that indicated an animus towards her for becoming pregnant -- direct mockery, denigrating comments, expression of concern that she might be a less-dedicated worker once she had children, that she would require more time off in the future for subsequent pregnancies, or that she would be less physically attractive because of her pregnancy -- then Shay might have stated facts giving rise to a plausible inference that she was fired for her pregnancy rather than for her leave.  Similarly, allegations that sick employees took similar leave periods under comparable circumstances but were welcomed back to their jobs with open arms could also give rise to a plausible inference of discrimination.  In the absence of such facts, however, this case is an

---

[13]Although plaintiffs need not set forth the full prima facie elements of a Title VII case -- such as that the position to which the plaintiff applied remained open and accepting applications after the plaintiff's rejection, or that the plaintiff was qualified for the position, see McDonnell Douglas Corp. v. Green, 411 U.S. at 802-03 -- in their pleadings, the pared down elements of EEOC v. PVNF, LLC apply in full force even at the motion-to-dismiss stage.  To the extent that McDonnell Douglas Corp. v. Green elements are established or disclaimed in the pleadings, courts should consider those facts in assessing whether "circumstances giv[e] rise to an inference of discrimination."  EEOC v. PVNF, LLC, 487 F.3d at 800.  See Messina v. Kroblin Transp. Sys., Inc., 903 F.2d 1306, 1308 (10th Cir. 1990)("McDonnell Douglas inferences provide assistance to a judge as he addresses motions to dismiss, for summary judgment, and for directed verdict.").

example of an allegation "encompass[ing] a wide swath of conduct, much of it innocent." Robbins v. Oklahoma, 519 F.3d at 1247.  Shay's "allegations must be enough that, if assumed to be true, [she] plausibly (not just speculatively) has a claim for relief," but Shay's allegations here give rise to only speculative and remote indication that a cause of action exists.   Robbins v. Oklahoma, 519 F.3d at 1247.   Shay "ha[s] not nudged [her] claims across the line from conceivable to plausible."  Bell Atl. Corp. v. Twombly, 550 U.S. at 570.  The Court will, therefore, dismiss Counts II and III.

## II.      THE COURT WILL DISMISS COUNT IV, BECAUSE A FEDERAL CONTRACTOR'S EMPLOYEES ARE NOT THIRD-PARTY BENEFICIARIES TO THE CONTRACTUAL TERM THAT EXECUTIVE ORDER 11246 MANDATES BE INCLUDED IN ALL FEDERAL CONTRACTS.

The Court will next address Count IV, Shay's claim that: (i) RWC breached its contract with the United States, specifically a nondiscrimination term which is included in all federal contracts by virtue of an executive branch policy outlined in Executive Order 11246; and (ii) Shay is entitled to sue as a third-party beneficiary to the contract between RWC and the United States.  The Court is faced with two options at this point.  If Count IV arises under federal law, then the Court has subject-matter jurisdiction and must proceed to decide the merits of the federal claim.  If Count IV does not arise under federal law, then the Court -- having already dismissed all the claims that do -- must generally decline supplemental jurisdiction, abstain from ruling on Count IV, and remand the case to state court.  The Court concludes that Count IV arises under federal law, because the face of the well-pleaded claim presents a substantial and actually disputed question of federal law, the answer to which is necessary to the resolution of the claim.  The Court next concludes that Executive Order 11246 does not contemplate that a federal contractor's employees will be third-party beneficiaries of the contractual term in

question ("the 11246 term"), and thus Shay is not an intended third-party beneficiary.  The Court will therefore dismiss Count IV.

The Court will, at the outset of this analysis, set forth a few background principles.  The elements of a third-party beneficiary claim for breach of contract are the same as those for material breach, plus the additional requirement that the third party: (i) receive a benefit from the promisor's performance that the promisee[14] intended for the third party to receive; and (ii) the contract manifests the intent to grant the third party an independent cause of action to enforce the promise.  See Callahan v. N.M. Federation of Teachers -- TVI, 2006-NMSC-010, ¶¶ 19-21, 139 N.M. 201, 208, 131 P.3d 51, 58; Restatement (Second) of Contracts § 304 (1981).  "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested."  Restatement (Second) of Contracts § 313 cmt. a.

The federal policy in question, Executive Order 11246, deals with equal employment opportunity within the control of the executive branch generally: Part I covers "nondiscrimination in government employment"; Part II covers "nondiscrimination in employment by government contractors and subcontractors"; and Part III covers "nondiscrimination provisions in federally assisted construction contracts."  Executive Order 11246, 30 F.R. 12319 (1965).  The relevant part here, Part II, provides that

> all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

---

[14]In the general parlance of contract law, all parties to a contract are by definition both promisors and promisees, as all parties must offer consideration -- the promise of performance -- for the contract to be valid.  As far as a third-party beneficiary is concerned, however, only the party whose performance benefits him or her is the promisor.  In the context of the 11246 term, the federal contractor -- here RWC -- is the promisor.

During[15] the performance of this contract, the contractor agrees as follows:

(1)     The contractor will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin.[16]     The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin.  Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)     The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

(3)     The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post

---

[15]The Westlaw version of Executive Order 11246 contains a number of extraneous apostrophes before each numeral that the Court believes were not in the original.  The Court has deleted them for the sake of eliminating confusion.

[16]The Court notes that neither "sex" nor "gender" is listed as one of Executive Order 11246's protected classes.  Shay alleges, however, and RWC never contests, that the contract between RWC and the United States contained an anti-sex discrimination provision.  See Complaint ¶ 88, at 10.

- 60 -

copies of the notice in conspicuous places available to employees and applicants for employment.

(4)    The contractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5)    The contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6)    In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7)    The contractor will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rule, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, That in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result

of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

Executive Order 11246 § 202, 30 F.R. 12319.  The Executive Order later sets forth its own

penalty scheme for violation of the contractual term:

In accordance with such rules, regulations, or orders as the Secretary of Labor may issue or adopt, the Secretary or the appropriate contracting agency may:

(1)   Publish, or cause to be published, the names of contractors or unions which it has concluded have complied or have failed to comply with the provisions of this Order or of the rules, regulations, and orders of the Secretary of Labor.

(2)   Recommend to the Department of Justice that, in cases in which there is substantial or material violation or the threat of substantial or material violation of the contractual provisions set forth in Section 202 of this Order, appropriate proceedings be brought to enforce those provisions, including the enjoining, within the limitations of applicable law, of organizations, individuals, or groups who prevent directly or indirectly, or seek to prevent directly or indirectly, compliance with the provisions of this Order.

(3)   Recommend to the Equal Employment Opportunity Commission or the Department of Justice that appropriate proceedings be instituted under Title VII of the Civil Rights Act of 1964.

(4)   Recommend to the Department of Justice that criminal proceedings be brought for the furnishing of false information to any contracting agency or to the Secretary of Labor as the case may be.

(5)   Cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended, any contract, or any portion or portions thereof, for failure of the contractor or subcontractor to comply with the non-discrimination provisions of the contract. Contracts may be cancelled, terminated, or suspended absolutely or continuance of

> contracts may be conditioned upon a program for future compliance approved by the contracting agency.
>
> (6)     Provide that any contracting agency shall refrain from entering into further contracts, or extensions or other modifications of existing contracts, with any noncomplying contractor, until such contractor has satisfied the Secretary of Labor that such contractor has established and will carry out personnel and employment policies in compliance with the provisions of this Order.

Executive Order 11246 § 209, 30 F.R. 12319.  The Executive Order never references a "third-party beneficiary" or any close variant, nor does it explicitly permit or condone suits by employees for breach of the 11246 term.  See Executive Order 11246, 30 F.R. 12319.  Not much is known about why President Lyndon B. Johnson issued the order -- Title VII had passed a year before he issued the order, and gave substantively broader rights to all citizens and not just to federal contractor employees -- and the Supreme Court has noted that the order's origins "are somewhat obscure and have been roundly debated by commentators and courts."  Chrysler Corp. v. Brown, 441 U.S. 281, 304 (1979).

## A.     SHAY'S STATE LAW CLAIM CONTAINS A FEDERAL INGREDIENT SUFFICIENT TO IMPART THE COURT WITH FEDERAL-QUESTION JURISDICTION.

In a case removed from state court, such as this one, the burden of demonstrating jurisdiction is generally on the defendant.  See Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921)("[T]he petitioning defendant must take and carry the burden of proof, he being the actor in the removal proceeding."  (citation omitted)).  Furthermore, the plaintiff is the master of his claim:

> [I]f he chooses not to assert a federal claim, or fails to join a party who could remove the entire action, or properly joins a nondiverse party, defendants cannot remove the action to federal court on the ground that an alternative course of conduct that was available to the plaintiff would have permitted removal of the case.

14B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard

D. Freer, Helen Hershkoff, Joan E. Steinman, Catherine T. Struve, Federal Practice & Procedure,

Jurisdiction & Related Matters § 3721 (4th ed. 2014).  If the plaintiff asserts a state law-created

cause of action, then the Court has federal-question jurisdiction only if there is a substantial,

actually disputed federal question on the face of the well-pleaded claim, the resolution of the

federal question is necessary to adjudicate the claim, and federal jurisdiction would not disrupt

any congressionally approved balance of federal and state judicial responsibilities.[17]  See Grable

& Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005).  See also

Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149 (1908).  For her part, Shay has pled

Count IV as a state law-created cause of action, disclaims all reliance on federal law, and asks

---

[17]The Court notes that two other courts -- the Court of Appeals for the Ninth Circuit and a district court in the District of Columbia -- have concluded that they lack federal-question jurisdiction to adjudicate a third-party beneficiary breach-of-contract claim based on federal contracts, even where an executive order or statute mandated the inclusion of the allegedly breached term in the contract.  See Utley v. Varian Assocs., Inc., 811 F.2d 1279 passim (9th Cir. 1987); Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59, 69-70 (D.D.C. 2002).  Both of these cases came out before Grable & Sons Metal Products v. Darue Engineering.  Before Grable & Sons Metal Products v. Darue Engineering, federal-question jurisdiction was largely limited to federally-created causes of action; for a state law cause of action to support federal-question jurisdiction required either that: (i) Congress specifically granted the federal courts jurisdiction to hear the claim in question; or (ii) there was complete federal preemption barring the state claim. See Utley v. Varian Assocs., Inc., 811 F.2d at 1287 ("The artful pleading doctrine . . . provides that if a federal cause of action completely pre-empts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily arises under federal law." (quoting Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 24 (1983))(internal quotation marks omitted)).  Grable & Sons Metal Products v. Darue Engineering replaced this preemption-or-nothing approach with a more textured -- and liberal -- approach to assessing federal-question jurisdiction over state law-created claims.  See 545 U.S. passim.

that, if the Court dismisses Counts II and III, it remand Count IV to state court without dismissing it.[18]

> ### 1.     A Federal Question Appears on the Face of the Well-Pleaded Claim, Because a Third-Party Beneficiary Claim Requires Demonstrating That the Contracting Parties Intended that Such a Claim Be Actionable, and That Determination Requires Interpreting Executive Order 11246.

The Court must first identify the federal question, if any, that exists on the face of the well-pleaded claim.  The Court concludes that the United States' intent -- or lack thereof -- to create an independent cause of action enforceable by employees such as Shay constitutes a federal question and that question is also present on the face of the claim.  In a typical third-party beneficiary breach-of-contract claim under state law -- which is all that Shay hopes to bring[19] --

---

[18]The Defendants demand that Shay's claim be construed as a federal claim, see Tr. at 52:24 (Montoya), and then, in the same breath, they point out (correctly) that the Tenth Circuit has held that no such claim exists, see Tr. at 53:6-11 (Montoya)(referencing Suazo v. Regents of Univ. of Cal., 149 F.3d at *2) -- apparently not recognizing that the success of their second argument undercuts their first.  The Court does not construe claims in the manner that the defendant chooses, particularly if the defendant has chosen a construction that will walk the claim directly into certain doom -- this time in the form of Tenth Circuit precedent.  The Court concludes that Count IV brought under state law.

[19]For the purposes of this analysis, the Court assumes without deciding that New Mexico contract law governs this claim, but it is quite possible that Shay's claim is controlled by federal common law.  Breach-of-contract suits on federal contracts, when brought against the United States, are brought under the federal common law.  When the suit does not involve the proprietary interests of the United States, however, i.e., when the United States is not a party, the Supreme Court has been more ambivalent about the proper source of law.  In Miree v. DeKalb County, Georgia, 433 U.S. 25 (1977)(Rehnquist, J.), the Supreme Court applied Georgia law, and not federal common law, to a third-party beneficiary claim against a federal contractor working for the Federal Aviation Administration.

> The litigation before us raises no question regarding the liability of the United States or the responsibilities of the United States under the contracts.  The relevant inquiry is a narrow one: whether petitioners as third-party beneficiaries of the contracts have standing to sue respondent.  While federal common law may govern even in diversity cases where a uniform national rule is necessary to further the interests of the Federal Government, Clearfield Trust Co. v. United States, 318 U.S. 363 (1943), the application of federal common law to resolve the

issue presented here would promote no federal interests even approaching the magnitude of those found in <u>Clearfield Trust</u>:

> The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states.  The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty.  It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states.  The desirability of a uniform rule is plain.

<u>Clearfield Trust Co. v. United States</u>, 318 U.S. at 367.

But, in this case, the resolution of petitioners' breach-of-contract claim against respondent will have no direct effect upon the United States or its Treasury.  The Solicitor General, waiving his right to respond in these cases advised us:

> In the course of the proceedings below, the United States determined that its interests would not be directly affected by the resolution of these issue(s) and therefore did not participate in briefing or argument in the court of appeals. In view of these considerations, the United States does not intend to respond to the petitions unless it is requested to do so by the Court.

The operations of the United States in connection with FAA grants such as these are undoubtedly of considerable magnitude.  However, we see no reason for concluding that these operations would be burdened or subjected to uncertainty by variant state-law interpretations regarding whether those with whom the United States contracts might be sued by third-party beneficiaries to the contracts.  Since only the rights of private litigants are at issue here, we find the <u>Clearfield Trust</u> rationale inapplicable.

. . . .

> In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.  It is by no means enough that, as we may assume, Congress could under the Constitution readily enact a complete code of law governing transactions in federal mineral leases among private parties. Whether latent federal power should be exercised to displace state law is primarily a decision for Congress.

_____

Wallis v. Pan Am. Petrol. Corp., 384 U.S. 63, 68 (1966).

> The question of whether private parties may, as third-party beneficiaries, sue a municipality for breach of the FAA contracts involves this federal interest only insofar as such lawsuits might be thought to advance federal aviation policy by inducing compliance with FAA safety provisions. However, even assuming the correctness of this notion, we adhere to the language in Wallis, cited above, stating that the issue of whether to displace state law on an issue such as this is primarily a decision for Congress. Congress has chosen not to do so in this case. Actually the application of federal common law, as interpreted by the Court of Appeals here would frustrate this federal interest *pro tanto*, since that court held that this breach-of-contract lawsuit would not lie under federal law. On the other hand, at least in the opinion of the majority of the panel below, Georgia law would countenance the action. Even assuming that a different result were to be reached under federal common law, we think this language from Wallis all but forecloses its application to these cases:
>
> > "Apart from the highly abstract nature of (the federal) interest, there has been no showing that state law is not adequate to achieve it." Id., at 71. We conclude that any federal interest in the outcome of the question before us "is far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern. Parnell, 352 U.S., at 33-34.

Miree v. DeKalb Cnty., Ga., 433 U.S. at 28-34 (footnotes omitted).

The case for applying federal common law is somewhat stronger here, because the contractual term in question appears in every federal contract, and thus -- as compared to an individual term, often negotiated by on-site representatives, in a single federal contract -- the aggregate interests of the United States are great. If the United States has to pay more for contracted work because a state's laws are imparting too much liability onto contractors, then that may be said to constitute a federal proprietary interest. If the federal common law applied, then it would, in practical effect, displace any state claims for third-party breach of contract, and that displacement would additionally supply the Court with automatic federal-question jurisdiction. The Court of Appeals for the Eleventh Circuit has held that federal-question jurisdiction exists as it relates to third-party beneficiary claims for breach of federal contractual terms that § 503 of the Rehabilitation Act of 1973 mandates, because the federal common law displaces any state law contract claims purporting to provide relief to third-party beneficiaries. See Howard v. Uniroyal, Inc., 719 F.2d 1552 *passim* (11th Cir. 1983)("[T]he identity of the present third party beneficiary action and section 503(b) enforcement and the inherent possibility of conflict between the two further evidence Congress' intent to pre-empt a state law third party beneficiary action seeking enforcement of section 503(b)."). While this displacement would not be a preemption in the way ERISA preempts state law claims, in this context of third-party beneficiary claims it would negate any state law claims. After all, neither Title VII nor Executive Order 11246 preempts all state law claims, but only certain ones.

the third-party must demonstrate both that she benefitted from the promisor's performance and that the promisee intended for her to be able to sue on her own behalf to enforce the contract. The second requirement involves an interpretation of federal law, namely Executive Order 11246. Although the intent inquiry is normally a factual one, the question of the United States' "intent" to create an actionable right for federal contractor employees is purely legal: it not only involves interpreting Executive Order 11246 -- that is all that it involves.

This conclusion is not to say that all third-party breach-of-contract claims present federal questions; sometimes -- especially where the contractual term involved is specific to the individual contract in question, and not included pursuant to a general policy of inclusion -- the inquiry into the United States' intent is a factual one. See, e.g., Miree v. DeKalb Cnty., Ga., 433 U.S. 25, 28-34 (1977); Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC, 606 F. Supp. 2d 114 (D.D.C. 2009)(finding that federal common law did not govern a third-party beneficiary breach-of-contract suit against a federal contractor, and that the district court thus lacked federal-question jurisdiction to adjudicate the claim). Here, however, the question of the United States' intent in including the 11246 term -- an element vital to Shay's well-pleaded claim -- is a question of federal law.

---

The Court indulges the assumption that state law controls for two reasons. First, the argument against federal-question jurisdiction is stronger if state law governs the dispute and almost nonexistent if federal common law governs it. The Court wants to make it clear that either conclusion would result in the same outcome -- that the Court has federal-question jurisdiction. Second, as there is no federal common law directly on point, the Court would look to state law sources to inform its determination of federal common law regardless. As such, the Court concludes that the choice-of-law issue presents a false conflict, because the Court would go through identical inquiries under both of the potentially controlling bodies of law.

**2.** **The Federal Question on the Face of the Well-Pleaded Claim Satisfies all of the Requirements of Grable & Sons Metal Products v. Darue Engineering, and, thus, the Court Has Federal Question Jurisdiction over the Count IV.**

Not only does a federal question -- whether the United States intended, via Executive Order 11246, to allow third-party beneficiary claims for breach of the 11246 term -- appear on the face of the well-pleaded claim, but it also satisfies the additional Grable & Sons Metal Products v. Darue Engineering requirements that the question be: (i) necessary to the resolution of the claim; (ii) actually disputed; (iii) substantial; and (iv) non-disruptive to any congressionally approved balance of federal and state judicial responsibilities. See Grable & Sons Metal Prods. v. Darue Eng'g, 545 U.S. at 312. The federal question is necessary to the resolution of the claim, because Count IV turns entirely on it: if the United States intended to impart a third-party beneficiary cause of action for breach of the 11246 term, then Shay's claim is viable; if the United States did not so intend, then her claim must fail. There is no alternative basis upon which the Court can adjudicate the claim. The claim is actually disputed for the same reason: this issue is not a pretextual basis of jurisdiction -- an uncontested federal element to which a party points for the sole purpose of establishing federal jurisdiction. The question is substantial both because it is necessary to the resolution of this claim and because it determines the viability of this entire genus of claims. Whether any federal contractor employee can bring a third-party beneficiary claim for breach of the 11246 contract turns on the outcome of this question. Last, the Court adjudicating the issue does not disrupt the balance of federal and state judicial responsibilities. While styled as a state law claim -- this test is designed only for state law claims, as federal-question jurisdiction automatically covers federal claims without the need for a Grable & Sons Metal Products v. Darue Engineering analysis -- the interests involved are primarily federal. This issue can only arise in the context of federal contracts and, more directly,

involves interpretation of a federal executive order.  The Court concludes that it has federal-question jurisdiction to adjudicate Count IV.

   **B.   THE COURT WILL DISMISS COUNT IV, BECAUSE THE UNITED STATES DID NOT INTEND TO IMPART FEDERAL CONTRACTOR EMPLOYEES SUCH AS SHAY WITH THE ABILITY TO LAUNCH THIRD-PARTY BENEFICIARY SUITS FOR BREACH OF THE 11246 TERM.**

   Turning to the merits of Count IV, the Court concludes that Shay is not an intended third-party beneficiary of the 11246 term, and the Court will thus dismiss the claim.  The Court comes to this conclusion on the basis of three considerations.  First, Executive Order 11246 contains a list of no fewer than six penalties that the United States can doll out on contractors who violate the 11246 term, including publishing the names of noncompliant contractors, suspending or terminating the contractual relationship, and initiating civil or criminal proceedings or seeking an injunction.  Conspicuously absent from the list -- or from anywhere in Executive Order 11246 -- is a provision permitting employees to sue as third party beneficiaries, despite that they are the people victimized when there is a breach of the 11246 term.

   Second, and related, the 11246 term itself -- the portion of Executive Order 11246 that is included in all federal contracts -- fails to meet the ordinary test for imparting third-party beneficiary status.  There is no manifestation of intent to create a third-party cause of action. The United States is the ultimate sophisticated party; it knows what words to put into a contract to trigger third-party beneficiary status, and the absence of these words suggests that no such status was intended.[20]  In fact, it is possible that Executive Order 11246 was not designed for the

---

[20]Just this April, President Barack H. Obama amended Executive Order 11246 to add a non-retaliation clause to all federal contracts.  See Executive Order 13665, 79 F.R. 20749 (2014). Not only did the new order not add language suggesting that federal contractor employees are intended third-party beneficiaries, it also added the following language: "This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at

benefit of federal contractors' employees at all; after all, the obligations laid out in the 11246 term are coextensive with those of Title VII, and, moreover, if the United States' intent had been to protect and secure the civil rights of its citizens, there would be no reason to extend these benefits only to federal contractor employees.  The addition of the Executive Order overlay on top of the generally applicable Title VII requirements[21] may be for the benefit of the United States rather than for private citizens.  The United States reaps several possible benefits from Executive Order 11246.  It lessens the probability that a federal contractor will violate Title VII, as doing so would also violate the 11246 term; the inclusion of the term in the contract also reminds contractors of their legal obligations under Title VII, and that the United States takes them seriously.   It creates the appearance that the United States holds itself to a higher standard -- or at least to the same standard to which it holds its citizens -- and provides plausible deniability and cover for any Title VII violations that its contractors may commit.  Last, it signifies to private employers who may be unhappy about having to comply with Title VII that the United States also conducts its business in compliance with Title VII,[22] and that they will be unable to obtain federal contracts if they do not comply with Title VII -- even if they are

---

law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."  Executive Order 13665 § 5(d).

President Obama's order has no effect on this case, as it applies only "to contracts entered into on or after the effective date of rules promulgated by the Department of Labor under section 3 of this order."  Executive Order 13665.

[21]Title VII was passed into law in 1964, a year before the issuance of Executive Order 11246.

[22]When viewed along with the Part I of the order, which governs "nondiscrimination in government employment," the Court's suggestion that Executive Order 11246 exists more as a "good government" provision than a provision creating enforceable primary rights becomes even stronger.  Executive Order 11246, 30 F.R. 12319.

successful at avoiding private lawsuits.  In projecting this image, the United States enhances both its own legitimacy and the legitimacy of Title VII in the public's eyes.

Third, courts -- including the Tenth Circuit -- have across the board ruled that Executive Order 11246 does not create a private cause of action and have refused to imply one into it.  See, e.g., Suazo v. Regents of Univ. of Cal., 149 F.3d at *2 ("[W]e join the other courts that have addressed the issue and hold that plaintiff has no private right of action under . . . Executive Order 11,246.").  Shay "cannot circumvent this conclusion by arguing that she is a third-party beneficiary to the contract," as to do so would disrupt the administrative scheme laid forth in both the penalties portion of Executive Order 11246 and Title VII itself.  Brug v. Nat'l Coalition for Homeless, 45 F. Supp. 2d 33, 41 (D.D.C. 1999).

In concluding that federal employees may not bring third-party beneficiary claims for breach of the 11246 term, the Court joins the majority of other courts to have considered the issue.  See Dean v. Boeing Co., No. 02-1019-WEB, 2002 WL 1299772, at *3 (D. Kan. June 4, 2002)("Although a few courts have permitted third-party claims of the type asserted by plaintiffs, this court believes such claims are inconsistent with the federal regulatory scheme for policing government contracts under Executive Order No. 11246."); Brug v. Nat'l Coalition for Homeless, 45 F. Supp. 2d at 41 & n.12; Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1532 (M.D. Fla. 1991)("The third-party beneficiary theory is merely derivative of the private cause of action theory and the former cannot be entertained given the disposition of the latter."); Traylor v. Safeway Stores, Inc., 402 F. Supp. 871, 876 (N.D. Cal. 1975)("It would be obviously destructive of the administrative scheme [explained in detail in Executive Order 11,246] to allow it to be short-circuited" through state third-party beneficiary law.).  See also Farkas v. Texas Instrument, Inc., 375 F.2d 629, 633 (5th Cir. 1967)(refusing to imply a private

right of action or allow a third-party beneficiary claim based on Executive Order 10,925, the predecessor to Executive Order 11,246).   The Court acknowledges that some courts have allowed third-party beneficiary claims for breach of the 11246 term, but notes that these decisions have come almost entirely out of courts bound by precedent from the Court of Appeals for the Seventh Circuit.   See D'Amato v. Wis. Gas Co., 760 F.2d 1474, 1478 (7th Cir. 1985); Manuel v. Int'l Harvester Co., 502 F. Supp. 45 (N.D. Ill. 1980).   These decisions were compelled, however, by stare decisis -- specifically, by an old, conclusory, and somewhat wobbly Seventh Circuit case called Jones v. Local 520, International Union of Operating Engineers, 603 F.2d 664 (7th Cir. 1979).   That case stated:

> In dismissing Counts I and II, the district court held that the appellants did not have a cause of action under 42 U.S.C. [§] 1981 since the agreement represented a preferential hiring plan and [§] 1981 provides only that all persons shall have the same rights "as is enjoyed by white citizens."   We cannot agree, however, that the appellants' action is not maintainable under [§] 1981.   In our view, the agreements create third party beneficiary rights in the white and black operating engineers who stand to benefit from the operation of the referral plan. The appellants' complaint alleges that the beneficiary rights of black engineers are not being recognized by the defendants-appellees because of racial considerations.   In particular, the complaint alleges that the contractors have deprived the blacks of their beneficiary rights by accepting whites who are masquerading as minority group members to satisfy the 20 percent requirement. We find these allegations of a racially motivated deprivation of beneficiary rights sufficient to maintain an action under [§] 1981.   It follows that the district court has jurisdiction over Counts I and II under 28 U.S.C. [§] 1343.

603 F.2d at 665-666.   No further analysis was conducted, nor was more elaborate reasoning given.

The Court is not bound by Seventh Circuit precedent, and is unpersuaded by it.   Because federal contractor employees such as Shay are not intended third-party beneficiaries of the 11246 term, the Court will dismiss Count IV.

**III.    THE COURT WILL REMAND THE CASE TO STATE COURT PURSUANT TO 28 U.S.C. § 1367(c)(3), BECAUSE IT HAS DISMISSED ALL THE FEDERAL CLAIMS.**

The Court will remand this case to state court, because, in dismissing Counts II, III, and IV, it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3). The Tenth Circuit has held that it is always acceptable, and almost always preferable, for a district court to remand a case in this circumstance.  See Koch v. City of Del City, 660 F.3d at 1228, 1248 (10th Cir. 2011); Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.).  When the Defendants removed this case to federal court, they asserted only federal-question jurisdiction as a basis of original jurisdiction.  See Notice of Removal at 2.  Although it is possible that diversity -- another basis of original jurisdiction, which would impart federal subject-matter jurisdiction as to all Counts -- may exist between the parties, the Defendants: (i) did not plead this basis in their original Notice of Removal; (ii) never attempted to amend their Notice of Removal to add diversity as a jurisdictional ground; and (iii) did not respond to the Court's inquiry about Wren's citizenship. The Defendants have, thus, forfeited this basis, if it ever even existed, and the Court will decline to exercise supplemental jurisdiction now that its original federal-question jurisdiction has been extinguished.  The Court remands the case back to the State of New Mexico Second Judicial District Court.

**IT IS ORDERED** that the Defendants' Motion to Dismiss Complaint, filed February 15, 2013 (Doc. 6), is granted as to all federal claims, those being Counts II, III, and IV.  Because the remaining claims involve interpretation of state law, the Court will decline to exercise its supplemental jurisdiction and will remand the case to state court.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Andrew M. Sanchez, Sr.
Cuddy & McCarthy, LLP
Albuquerque, New Mexico

     *Attorney for the Plaintiff*

Victor P. Montoya
Jackson Lewis LLP
Albuquerque, New Mexico

     *Attorney for the Defendants*